# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mays*, 2012 IL App (4th) 090840

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUVON F. MAYS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-09-0840 |
| Filed<br>Rehearing denied | August 30, 2012<br>October 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant was initially charged with three counts of murder, but he was convicted of home invasion and two counts of felony murder that were filed several months after the initial charges were filed, and the State subsequently abandoned the initial charges, his convictions did not violate his right to a speedy trial, since the later charges could not reasonably be considered "new and additional" for purposes of a speedy-trial analysis; however, the cause was remanded for a *Krankel* inquiry into defendant's claim his counsel was ineffective in prompting the State to file the additional charges. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 08-CF-2293; the Hon. Thomas J. Difanis, Judge, presiding. |
| Judgment | Affirmed as modified and remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Amber Gray, all of State Appellate Defender's Office, of Springfield, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Aimee Sipes Johnson, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices McCullough and Cook concurred in the judgment and opinion.

## OPINION

¶ 1    In December 2008, the State charged defendant, Juvon F. Mays, with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) in the shooting death of Corinthian "Shawn" Spinks. On August 31, 2009, on the day of trial, the State filed three additional charges: one for home invasion (720 ILCS 5/12-11(a)(3) (West 2008)) and two for first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2008)) relating to the same incident. The jury convicted defendant of the new charges, as the State had abandoned the original murder charges. The trial court sentenced defendant to 60 years in prison.

¶ 2    Defendant appealed his convictions, claiming the State violated his right to a speedy trial by failing to bring him to trial within 120 days on the new and additional charges–charges which were subject to compulsory joinder. He asserted his trial counsel was ineffective for failing to move to dismiss the new charges based on a speedy-trial violation. He also claimed his trial counsel was ineffective for forwarding the prosecutor a letter with incriminating information without his permission and for demonstrating a misunderstanding of the theories of accountability and felony murder. He further claimed the trial court erred in failing to conduct an adequate *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) into his ineffective-assistance claims.

¶ 3    With regard to his sentencing judgment, defendant claimed the trial court erred by considering improper factors in fashioning the sentence. And, he disputed the imposition of certain fines and the amount of credit awarded.

¶ 4    Initially, we affirmed his conviction on the speedy-trial issue and affirmed his sentence but determined that the ineffective-assistance-of-counsel claim would be best considered in a postconviction proceeding. *People v. Mays*, 2011 IL App (4th) 090840-U (filed November 7, 2011, and modified on denial of rehearing on December 15, 2011; vacated May 9, 2012, pursuant to Illinois Supreme Court supervisory order). The supreme court, pursuant to its supervisory authority, directed this court to vacate our judgment and address the merits of defendant's claim or address the issue of whether the trial court failed to conduct a *Krankel*

inquiry. See *People v. Mays*, No. 113685 (Ill. Mar. 28, 2012) (nonprecedential supervisory order on denial of petition for leave to appeal). We have done so, without disturbing our previous decision on the speedy-trial and sentencing issues, and now affirm as modified and remand for further proceedings consistent with *Krankel* in accordance with our decision below.

¶ 5                                    I. BACKGROUND

¶ 6        On December 22, 2008, the State charged defendant with three counts of first degree murder for the December 20, 2008, shooting death of Corinthian "Shawn" Spinks. On February 5, 2009, the grand jury issued superseding indictments, alleging defendant, without justification and (1) with the intent to kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 2008)) (count I), (2) knowing that such acts could cause death (720 ILCS 5/9-1(a)(1) (West 2008)) (count II), and (3) knowing that such acts created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2008)) (count III), personally shot and killed Spinks.

¶ 7        On March 24, 2009, defendant's public defender, Randall Rosenbaum, filed a motion to continue the trial "in the interests of justice." On April 21, 2009, the State filed a motion to continue to secure forensic test results before proceeding to trial. On May 19, 2009, the trial court vacated the appointment of the public defender. Defendant's new attorney, G. Ronald Kesinger, filed an entry of appearance and a motion to continue. Defendant's jury trial was rescheduled to begin on August 31, 2009.

¶ 8        On August 17, 2009, Kesinger filed another motion to continue, claiming (1) he was involved in other litigation that compromised his ability to adequately prepare for defendant's trial, and (2) he was in the process of contacting witnesses. The trial court denied counsel's motion.

¶ 9        Included in the court file is a letter dated August 26, 2009 (filed August 31, 2009), from Kesinger to Duke Harris, a Champaign County assistant State's Attorney, stating that he would be proceeding with a defense that the shooting of Spinks was accidental. Kesinger reported that defendant's cousin, Brian Shaw, was with defendant at the time of the incident and was the person wearing the camouflage coat and "who had the pistol which discharged and killed Mr. Spinks." Apparently, defendant and Shaw were "trying to get [defendant's] personal property back as Brian Shaw had learned earlier in the morning that Roger Brown, and Spinks and another guy named 'Dude' were the ones who burglarized [defendant's] apartment. They went in with Brown's key and then kicked in the door to make it look like a forced entry." Defendant and Shaw wanted to confront Spinks about the burglary. When Spinks opened the door and saw defendant and Shaw, he tried to close it, but defendant "tried to put his arm through the door to get in." According to Kesinger, "the door hit the gun which Shaw had in his hand and it discharged." In the letter, Kesinger encouraged Harris to have Rantoul police officers reinterview the witnesses. He also requested a grant of immunity for a charge of obstruction of justice for several named witnesses "in order to obtain the truth" from them at trial.

¶ 10       As a result of Kesinger's letter, on August 31, 2009, the State filed three additional

charges against defendant. The prosecutor informed the trial court that Kesinger's letter "was tantamount to a confession to a felony murder," and he "felt at that point in time it was appropriate to add that charge." In count IV, the State alleged defendant, without lawful justification, while committing or attempting to commit a forcible felony, home invasion, personally discharged a firearm in Spinks's direction, thereby causing Spinks's death. See 720 ILCS 5/9-1(a)(3) (West 2008). In count V, the State alleged defendant, or one for whose conduct he was legally responsible, while committing or attempting to commit a forcible felony, home invasion, discharged a firearm in Spinks's direction, thereby causing Spinks's death. See 720 ILCS 5/9-1(a)(3) (West 2008). In count VI, the State alleged defendant committed a home invasion in that he entered Spinks's home, located at 1404 Hobson Drive, apartment B, in Rantoul, knowing that one or more persons were present and while armed with a firearm, threatened to use imminent force against Spinks and his wife, in that defendant threatened Spinks and his wife with the firearm. See 720 ILCS 5/12-11(a)(3) (West 2008).

¶ 11    Defendant's counsel filed an objection to the State's motion to file additional charges on the day scheduled for trial on the basis that he was ill-prepared to present a defense to these new charges. Counsel did not request they be dismissed on speedy-trial grounds. Noting that the felony murder charges were simply "different ways of charging the offense of first-degree murder," the trial court allowed the State to file, and to proceed to trial on, the additional charges and denied Kesinger's motion to withdraw as counsel.

¶ 12    Defendant's trial began on August 31, 2009, and continued over the course of five days. Since defendant does not challenge the sufficiency of the evidence, only those facts necessary to resolve the issues raised will be stated. Twanda Spinks testified first for the State. She said that, at approximately 9:30 a.m. on Saturday December 20, 2008, she, her husband Shawn (hereinafter referred to as Spinks), and her five children were in their apartment at 1404 Hobson Drive. She heard a knock on their door. She and Spinks had a rule that no one opened the door but him. Twanda went to the door and asked who it was. She could not make out the response, so she got Spinks out of bed. She had looked out the peephole and saw a man standing at the door with his head down. Another man, wearing a black leather coat, was standing across the hallway.

¶ 13    Spinks went to the door and asked who it was. Twanda could not hear the response. Spinks began turning the handle to open the door when a man forced his way into the apartment. Spinks struggled to keep the man out. During the struggle, the gun fired and a bullet hit Spinks. The man, wearing a ski mask and a camouflage jacket, entered the apartment and forced Twanda into the kitchen at gunpoint. He said: "Give it to me." Twanda had no idea what he was talking about. She asked: "Give you what?" She begged him to leave because her kids were home. She said he paused, put the gun down to his side, and ran out of the apartment.

¶ 14    Kathleen Faber, the apartment complex manager, testified there were four apartments on the first floor of their building. She lived next door to defendant, who lived across from Spinks. Defendant had lived in the complex for two months prior to the shooting. At the time of the incident, she heard "a big boom." She opened her apartment door and saw defendant run down the hallway. He was wearing a camouflage jacket and a black stocking cap, not

pulled over his face. She went inside to get her telephone and keys and then saw another man exit Spinks's apartment and enter defendant's apartment. The other man, whom Faber described as "very tall" with an Afro, wore a white "hoodie."

¶ 15 Latonia Perry testified that she lived directly above Spinks. On the morning of the incident, she left her apartment for work at approximately 9:30 a.m. She went down the stairs and saw a man in a camouflage coat and a ski mask "bammin and knockin" on Spinks's door. She did not see anyone else around. She heard someone inside the apartment asking who was at the door. The man in the ski mask looked at Perry "real like eerie" and told her something was going to happen and she should not be in the area. She proceeded to take her son to his babysitter in the next building. She went back to her apartment and then heard a loud "bam or shot" coming from Spinks's apartment. She saw the man in the camouflage coat walk out into the courtyard from their building and around the next building, while taking off his mask.

¶ 16 Roger Brown, a neighbor, first testified about his criminal history. He said he had been convicted "for drugs" in 2001 and burglary in 1997. He and his fiancée lived at 1405 Hobson Drive, another building within the apartment complex, where he worked as a maintenance man. On the morning of the incident, Brown was on his way to visit defendant. Twanda came out of her apartment and told Brown that Spinks had been shot. Brown entered Spinks's apartment and saw Spinks lying on the floor. Brown left when the police arrived. Brown saw defendant standing in the courtyard "with everybody else," but he could not recall what defendant was wearing. He denied telling the police that defendant was wearing a white long-sleeved thermal shirt.

¶ 17 Dana Laidley, security supervisor at Walmart in Rantoul, testified that the police had contacted her after the incident, indicating that a suspect had been in the store prior to the shooting. She searched her video surveillance recordings and found a video of the "gentleman with the coat that was in question" at register 18 checking out during the early morning hours before the shooting. A photograph taken from the video depicted defendant at the cash register wearing the camouflage coat and stocking cap that were found at the scene.

¶ 18 Several Rantoul police officers testified about their individual involvement in the shooting investigation. One officer found a camouflage coat in a storage closet on the second floor of defendant's apartment building. Several witnesses had reported seeing defendant wearing the coat on the morning of the incident. Inside the pockets of the coat, officers found (1) a bank deposit slip bearing defendant's name, (2) an envelope with a house key inside, with the name "Mays" and "1404 Hobson Drive, Apartment D," written on the outside, and (3) a pair of latex gloves. Another officer found two handguns, two stocking caps, and a white glove lying on the ground outside of one of the apartment buildings within the complex.

¶ 19 Michael Kyrouac of the Illinois State Police testified that he investigated the shooting. He noticed a bullet hole in Spinks's apartment door, apparently the entry hole, which had soot around it. This indicated that the barrel of the gun was fired in close proximity to the door. Further, according to Kyrouac, the manner in which the soot was distributed around

the hole indicated that the shooting did not occur as a result of the door hitting the gun causing it to discharge. On cross-examination, Kyrouac testified that no latent fingerprints were found on the guns.

¶ 20    Matthew Bross, a Rantoul police officer, testified that on December 20, 2008, at approximately 2:30 a.m., he was dispatched to defendant's apartment for a reported burglary. (These events took place before the shooting, which occurred later that same morning.) When Bross arrived, he met with defendant in the presence of three females. Defendant reported that the burglary to his apartment apparently occurred between 3 p.m. and 1:30 a.m. Bross noticed a footprint on the front door of defendant's apartment. Defendant believed a maintenance man, Brown, may have been responsible because he had seen defendant bringing the items that were taken into his apartment. Brown was working at defendant's neighbor's apartment at the time. Defendant reported that two televisions, an Xbox game console, a video game, a Dell computer, and his children's Christmas gifts were taken.

¶ 21    Everett Krueger, a parole agent with the Illinois Department of Corrections, testified that he supervised defendant's parole beginning in October 2008. Defendant had been compliant with the terms of his parole. He maintained contact with Krueger and had secured employment. Defendant wore an electronic detention monitoring system on his ankle, so Krueger was able to discern that defendant had left his apartment at 9:31 a.m. on Saturday December 20, 2008. After that, Krueger lost track of defendant until January 8, 2009, when defendant was arrested in Nashville, Tennessee.

¶ 22    Several forensic scientists testified regarding various testing he or she performed on the items in evidence. The extent of the incriminating evidence revealed that defendant could not be excluded as one of three contributors to the deoxyribonucleic acid (DNA) found on both stocking caps, one of two contributors to the DNA found on the white glove, and one of two contributors to the DNA found on a pair of tennis shoes found at defendant's residence in Tennessee. The tennis shoes matched the impression left in the kitchen of the Spinks's apartment. There had been no latent fingerprints found on either gun.

¶ 23    Latoya Jones testified for the defense. She said she gave defendant and Shalita Cooper a ride home from work on December 20, 2008, when their shift ended at 12:15 a.m. They made a few stops, one of which was Walmart. Jones identified herself, Cooper, and defendant in the photograph from the Walmart surveillance video. When they arrived at defendant's apartment, they noticed his door had been kicked in. Defendant said someone had stolen two televisions, a computer, and his children's toys. Defendant called the police and the three " 'started drinkin' a little bit." Jones left at approximately 2:30 a.m. As she was leaving, a gentleman she did not know was arriving at defendant's apartment. Jones and defendant both were scheduled to work Saturday afternoon at 2:30 p.m. Jones asked if defendant needed a ride, but he said he had one arranged. Jones did not see defendant again.

¶ 24    Cooper testified consistently with Jones's testimony, except Cooper said it was defendant's cousin who had arrived as Jones was leaving. She said he did not stay very long. After he left, it was just Cooper and defendant. They were still drinking. Cooper left at approximately 4 a.m. She went to her babysitter's house in the same apartment complex. At 7 a.m., she took her children to her sister's house. At 10 a.m., Cooper went back to the

apartment complex because she had left her purse at her babysitter's house. She saw defendant at his aunt's house, which was "a ways" from the apartment complex. He asked for a ride to Champaign and Cooper obliged. She did not see him again.

¶ 25    Defendant testified on his own behalf. He said he was released on parole from the Illinois Department of Corrections in October 2008. For the first two months, he was compliant with his parole conditions. He got a job at Con-Air and the apartment on Hobson Drive. He said he had five children and was "mainly spendin' all [his] checks on [his] kids" for the upcoming Christmas holiday. After he, Cooper, and Jones got off work at 12:15 a.m. on December 20, 2008, Cooper and Jones agreed to give him a ride home. He testified consistently with Cooper and Jones regarding what they did after work.

¶ 26    However, defendant said at approximately 2 a.m., he knocked on Spinks's door. Spinks opened the door and asked defendant to come into the kitchen. When they got in the kitchen, defendant asked Spinks if he had seen anyone enter his apartment that day. Spinks said he had not, but he would ask his wife the next day. Defendant left. He then went to Kathleen Faber's apartment to ask her the same question. She had not seen anyone either. Defendant said: "And then she proceeded to ask me why I haven't been callin' her and how could I just have sex with her and not talk to her no more." Faber then told defendant to call the police and she would try to locate the owners of the apartment for him.

¶ 27    Defendant went back to his apartment and called the police. When they arrived, he gave them the necessary information. In the meantime, his cousin, Brian Shaw, arrived and told him that he had just been involved in an "altercation with somebody who was tryin' to sell [his] belongings." Defendant had told the police that he believed Brown had stolen his belongings because "he's known for breakin' in people's places." Defendant claimed Brown had been to his "house to fix stuff" and knew about "the valuable objects" defendant had in his apartment and knew what time defendant left for work. Defendant said Shaw told him that "Brown had somethin' to do with it" and that the items were in Spinks's apartment. Defendant said he told Shaw that he had just been over there and he did not see anything. Defendant said Shaw and Cooper both left his apartment at approximately 4 a.m.

¶ 28    Defendant testified that Shaw returned at 6 a.m. and said he had "found out everything." He had brought defendant a .38 caliber handgun for protection. Defendant said he did not want the gun because having it would be a violation of his parole. They talked for approximately three hours. Shaw asked if they should go talk to Brown about defendant's items. Defendant said: "[N]o 'cause if I go over there we gonna end up fightin' because I know he took my stuff." Shaw suggested that they go across the hall and ask Spinks whether Brown was involved. They decided to try.

¶ 29    Defendant said he knocked on Spinks's door and a female asked who it was. Shaw told her several times it was just "somebody." He then got aggravated and pulled his gun out. Spinks came to the door and asked who it was. Defendant said he responded: "I'm like 'this Juvon, the guy from across the hall.' " Spinks unlocked the door and opened it a little and Shaw put his foot by the door and started pushing the door open. Spinks pushed the door back. Shaw moved his foot and the door slammed on his arm. Defendant testified: "When the door slammed to his arm[,] the gun just went off. And when the gun went off [,] I was

just stuck there froze. I froze."

¶ 30    Defendant said Shaw ran back to defendant's apartment. Defendant saw Faber come out of her apartment as he ran out the back door of the building. Defendant said he did not know anyone had been shot. He said he ran into Brown on Maplewood Drive and Brown asked defendant what had happened. Defendant said he told him Shaw had done something "stupid." Brown took defendant to his aunt's house, but she was not home. As defendant began to reenter Brown's car, he saw Cooper and Jones arrive. They asked defendant if he needed a ride. He asked them to take him to Champaign and they agreed. When he got in the vehicle, Cooper asked defendant about what had occurred at defendant's building. Defendant told her he did not know.

¶ 31    Defendant said he was wrong for not telling the police what had happened. He said: "I understand that I'm just as wrong as the individual who pulled the trigger, and I'm not denyin' the fact of that. You know, I'm a man. I sit here today and I understand that my actions wasn't right, lyin', deceitful." Defendant said that, throughout the day on Saturday, he had received numerous threatening messages on his cellular telephone. He telephoned Shaw, who told him that someone had just been shooting at him. Shaw told defendant to leave Rantoul. Defendant's friend gave him a ride to the bus station and he went to his brother's house in Tennessee.

¶ 32    On cross-examination, the prosecutor asked defendant why he would get into Brown's vehicle when he believed it was Brown who had broken in to his apartment. Defendant explained that the two had discussed it and Brown told defendant that he was on his way over to defendant's house to explain that he had not stolen his items. Brown said the police had just questioned him about it. Defendant said he did not believe Brown's story. He said he still believes Brown was responsible. When asked if defendant still believed Spinks was responsible, defendant said: "Well, I don't know. I mean, due to the severity of how–it's hard to look at a person who deceased right now and think negative of 'em." Defendant rested.

¶ 33    In rebuttal, the State called Sergeant Beach. He testified that no one else had been charged in connection with Spinks's death. When Beach spoke with defendant in Tennessee after his arrest, defendant did not mention Brian Shaw or say the shooting was an accident.

¶ 34    The trial court advised the jury that defendant had been convicted of aggravated battery and unlawful possession of contraband in a penal institution. The court admonished the jury that those convictions should be considered only as to defendant's credibility and not as evidence of guilt. The court denied defendant's motion for a directed verdict and proceeded to the jury-instruction conference. During this conference, the prosecutor advised the court that the State was proceeding only on the newly filed charges of felony murder and home invasion and abandoning the original charges of first degree murder.

¶ 35    After closing arguments, the jury retired to deliberate. Thereafter, the jury returned guilty verdicts on the charges of home invasion and felony murder on the theory of accountability. The jury found the State had failed to prove that defendant personally discharged the firearm killing Spinks.

¶ 36    On September 29, 2009, Kesinger filed a posttrial motion claiming the trial court erred by (1) allowing the State to file the home-invasion charge on the day of trial, and (2) denying

counsel's motion to withdraw on the day of trial. Thereafter, defendant filed a *pro se* motion for a new trial alleging he received ineffective assistance of counsel.

¶ 37 On October 26, 2009, the trial court considered counsel's posttrial motion and denied the same. The court did not address defendant's *pro se* motion. The court proceeded to sentencing. Neither party presented testimonial evidence. After considering counsels' recommendations, the presentence investigation report, the victim-impact statement, defendant's statement in allocution, the applicable factors of aggravation and mitigation, the court entered a judgment of conviction on first degree felony murder only and sentenced defendant to 60 years in prison. This appeal followed.

¶ 38                               II. ANALYSIS

¶ 39                               A. Speedy Trial

¶ 40 Defendant claims his convictions must be vacated because the State failed to try him within 120 days of being taken into custody in violation of his right to a speedy trial. On December 22, 2008, the State filed three counts of first degree murder against defendant. These counts alleged intentional murder resulting from defendant personally firing a weapon at Spinks. See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2008). Defendant was arrested and taken into custody on January 10, 2009, the day his speedy-trial term began to run. On the day of trial, August 31, 2009, day 233, the State filed three new charges against defendant–two counts of felony murder (720 ILCS 5/9-1(a)(3) (West 2008)), one alleging defendant personally fired the weapon while committing a forcible felony and one alleging defendant's accountability for firing the weapon while committing a forcible felony, and one count of home invasion (720 ILCS 5/9-1(a)(3) (West 2008)). The State abandoned the original murder charges and the jury found defendant guilty of the newly filed charges.

¶ 41 Defendant argues that because the newly filed charges were based on the same conduct as the original charges, compulsory joinder principles applied, which required the State to bring defendant to trial by May 11, 2009, 120 days from January 10, 2009. Although defendant did not go to trial within 120 days from being taken into custody on the original charges, he claims the delays attributed to him related to those charges cannot be attributed to him on the new and additional charges.

¶ 42 Defendant raises a speedy-trial issue for the first time in this appeal. He excuses his procedural default, claiming the issue should be reviewed (1) under the plain-error doctrine or (2) because his trial counsel was ineffective for failing to raise the issue previously. Either way, we must first determine whether defendant's right to a speedy trial was violated. See *In re Samantha V.*, 234 Ill. 2d 359, 368-69 (2009) (in a plain-error analysis, the reviewing court must first determine whether any error occurred); *People v. Phipps*, 238 Ill. 2d 54, 65 (2010) (on an ineffective-assistance-of-counsel claim, the reviewing court must first determine whether there was a speedy-trial violation before it can determine whether counsel's performance was deficient or whether defendant suffered prejudice).

¶ 43 A defendant has a constitutional right as well as a statutory right to a speedy trial. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5(a) (West 2008). In this appeal, defendant does not raise a constitutional issue. Rather, he contends his

statutory right to a speedy trial was violated. Section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2008)) provides that a defendant shall be tried by a court of competent jurisdiction within 120 days from the date he was taken into custody. Even if a delay is attributable to a defendant on the original charges, a delay is not always attributable to a defendant on subsequently filed charges. *Phipps*, 238 Ill. 2d at 66.

¶ 44    Our supreme court referred to the following rule in these circumstances:

" 'Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained.' " *Phipps*, 238 Ill. 2d at 66 (quoting *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981)).

¶ 45    Initially, we note the State does not contend it was not aware of the facts giving rise to the subsequent charges at the start of the prosecution. The purpose of what has become known as the *Williams* rule is to avoid a " 'trial by ambush.' " *Phipps*, 238 Ill. 2d at 67 (quoting *People v. Williams*, 204 Ill. 2d 191, 207 (2003)). The question for a speedy-trial analysis is whether defendant had adequate notice of the subsequent charges to allow him to prepare and present a defense. "If the original charging instrument gives a defendant adequate notice of the subsequent charges, the ability to prepare for trial on those charges is not hindered in any way." *Phipps*, 238 Ill. 2d at 67. In other words, for speedy-trial purposes, the delays attributable to defendant on the original charges could be attributable to defendant on the newly filed charges only if the charges were essentially the same. See *Phipps*, 238 Ill. 2d at 70 (the defendant could not have been surprised by the subsequent charges because they were essentially the same as the original charges; there was no danger of " 'trial by ambush' ").

¶ 46    Nevertheless, the rule applies only when the original and newly filed charges are subject to compulsory joinder. *Phipps*, 238 Ill. 2d at 67. Defendant claims the felony-murder and home-invasion charges are subject to compulsory joinder. The State disagrees, claiming the felony-murder charges simply allege another theory of first degree murder, the crime charged in the original indictments. The State argues the new charges "merely informed defendant of another theory of first degree murder the State believed the evidence would support." As for the home-invasion charge, the State claims the new charge "was not based on the same act that formed the basis for the December 2008 charges, and therefore, the compulsory joinder statute did not apply."

¶ 47    We review *de novo* the legal question of whether the charges were subject to compulsory joinder. *Phipps*, 238 Ill. 2d at 67. We begin by examining the elements of each charged offense. Originally, the State charged defendant with three counts of first degree murder. Counts I and II alleged defendant either intended to kill or do great bodily harm and defendant knew that his act of personally discharging a firearm in the direction of Spinks

would cause Spinks's death. See 720 ILCS 5/9-1(a)(1) (West 2008). Count III alleged defendant knew that his act of personally discharging a firearm in the direction of Spinks created a strong probability of death or great bodily harm. See 720 ILCS 5/9-1(a)(2) (West 2008).

¶ 48 In the August 2009 information, the State charged defendant with two additional counts of first degree murder. Both count IV and count V alleged defendant killed Spinks while committing or attempting to commit the forcible felony of home invasion. See 720 ILCS 5/9-1(a)(3) (West 2008). Count IV alleged defendant personally discharged a firearm which killed Spinks. Count V alleged defendant, or one for whose conduct he was legally responsible, discharged a firearm which killed Spinks.

¶ 49 In the original charging instruments, the State did not charge defendant with any conduct related to a home invasion, nor was it apparent that the State had considered the possibility that another person had actually fired the weapon that killed Spinks. As we stated above, the critical point in a speedy-trial analysis is whether the original charges gave defendant adequate notice to prepare a defense to the subsequent charges. *Phipps*, 238 Ill. 2d at 69.

¶ 50 Defendant's argument that the State violated his right to a speedy trial fails for two reasons. First, the notion that defendant was guilty of felony murder (as opposed to the murder counts originally charged) and home invasion arose from the defendant's own counsel's communication with the State. If felony murder based on a home invasion was Kesinger's theory of the case, as he so advised Harris in writing, we cannot presume he was later surprised when the State agreed with him and filed the additional murder and home-invasion charges.

¶ 51 Second, it is clear that defendant, who was originally charged with the act of murder, was not prejudiced by a subsequent conviction for felony murder. As Justice Miller noted in *People v. Maxwell*, 148 Ill. 2d 116, 137 (1992):

"Illinois law recognizes only a single offense of murder, which may be committed in a variety of ways. Just as the method of committing murder is not integral to the offense and therefore need not be specified in the charging instrument [citation] ***, the precise statutory theory of the offense of murder is not a matter that must be specifically alleged."

¶ 52 As in *Maxwell*, defendant here had timely notice of the felony-murder charge and cannot reasonably argue surprise when his own lawyer suggested it. Whether Kesinger's conduct of writing the letter to Harris constituted ineffective assistance is discussed below.

¶ 53 For the purposes of this appeal, we conclude that the newly filed felony-murder and home-invasion charges did not violate defendant's right to a speedy trial because, under the facts of this case, those charges could not reasonably be considered "new and additional" for the purposes of a speedy-trial analysis.


¶ 54 B. Ineffective Assistance of Counsel

¶ 55 Defendant further claims his trial counsel rendered ineffective assistance by violating the attorney-client privilege and prompting the State to file the additional charges for which he

-11-

was convicted. In a *pro se* posttrial motion, defendant asserted his claim that his trial counsel was ineffective. However, the trial court did not address defendant's motion. Defendant argues the court violated *Krankel* by failing to make an adequate preliminary inquiry into his *pro se* posttrial claims. In our *de novo* review (see *People v. Moore*, 207 Ill. 2d 68, 75 (2003)), we agree with defendant and remand this case with directions to make an adequate inquiry into those claims.

¶ 56   We acknowledge that a trial court does not have to appoint a new defense counsel simply because a defendant alleges, after trial, that the current defense counsel has rendered ineffective assistance. *Moore*, 207 Ill. 2d at 77. Instead, according to *Krankel* and its progeny, the court "should first examine the factual basis" of the defendant's claims of ineffective assistance, to ascertain whether there was a "possible neglect of the case." *Moore*, 207 Ill. 2d at 77-78. If there was a "possible neglect of the case," the court should appoint new counsel to represent the defendant in a posttrial hearing on the *pro se* claims of ineffective assistance. *Moore*, 207 Ill. 2d at 78. If, on the other hand, after "adequate inquiry" into the "factual basis" of the claims, the court "determines that the claim[s] lack[ ] merit or pertain[ ] only to matters of trial strategy," the court may deny the *pro se* motion for a new trial, without appointing new counsel. *Moore*, 207 Ill. 2d at 77-78.

¶ 57   As the supreme court has explained, the trial court may consult several different sources of information when performing its preliminary inquiry into the *pro se* claims of ineffective assistance. The supreme court has said:

"During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79.

Thus, the court may talk with trial counsel. The court may talk with the defendant. The court may rely on its own previous observations of trial counsel's performance in the case. The court may, of course, rely on its own legal knowledge of what does and does not constitute ineffective assistance. The supreme court does not say when the trial court should talk with trial counsel and when the court should talk with the defendant. That depends on the claims and the circumstances.

¶ 58   The trial court must do whatever common sense suggests is necessary to an adequate investigation. Essentially, the investigation has two steps, in this order: (1) understanding the defendant's claims and (2) evaluating them for potential merit. Until the court takes the first step, the court is in no position to attempt the second step. Certain of the defendant's claims might be vague, conclusory, and enigmatic. In the wording of the claims, it might be unclear exactly what the defendant means. Probably there is no better person to ask than the defendant. Likewise, if the factual basis of a claim is unclear–if the defendant could be

relying on facts that are outside the record–the defendant again is probably the best person from whom to seek clarification. See *People v. Munson*, 171 Ill. 2d 158, 201 (1996) ("The [trial] court made every effort to ascertain the nature and substance of defendant's ineffectiveness claim."); *People v. Byron*, 164 Ill. 2d 279, 304-05 (1995) (noting that the trial court heard the defendant describe in detail the factual basis of the claim).

¶ 59    In his *pro se* motion for a new trial, defendant asserted that his trial counsel had rendered ineffective assistance by, *inter alia*, bringing new information to the State's attention, information which defendant deemed confidential, but the State deemed sufficient to support what it considered new and additional charges. Did the information in Kesinger's letter to Harris preclude defendant's ability to present the jury with an instruction on involuntary manslaughter? Did the letter admit defendant committed felony murder? Why did Kesinger send Harris the letter? Would the result of the proceedings have been different had Kesinger not sent the letter to Harris? The trial court needs to investigate the claims by inquiring of defendant and counsel.

¶ 60    As stated, the law mandates the trial court to conduct some type of preliminary inquiry into the underlying factual basis of a defendant's *pro se* posttrial claim of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 79. Because no such investigation occurred in this case, we must remand the cause to the trial court for a preliminary investigation into defendant's claims to determine whether the appointment of new counsel to effectively present defendant's claims is appropriate and necessary. See *Moore*, 207 Ill. 2d at 81.

¶ 61                                C. Sentencing Issues

¶ 62                        1. *Consideration of Sentencing Factors*

¶ 63    As for the alleged sentencing error, we find as follows. On October 26, 2009, the trial court called the matter for sentencing. First, the court indicated it had considered the presentence investigation report and the victim-impact statements. Neither party presented testimonial evidence and, instead, proceeded with their respective recommendations as to sentencing. The State recommended the maximum sentence of 60 years, while defendant recommended a sentence "closer to the minimum" of 20 years. Defendant made a statement in allocution, and the victim's aunt read Twanda's victim-impact statement in open court.

¶ 64    The trial court indicated it considered all relevant matters, noting there were no applicable *statutory* mitigating factors. However, the court found defendant's "relatively young" age of 28 was a nonstatutory factor in mitigation, as well as the fact that defendant had shown a few months of compliance with his latest parole terms. For factors in aggravation, the court relied on the following: (1) defendant's criminal history (this was his sixth conviction); and (2) his juvenile record (he was "literally raised by the juvenile court system"). The court noted that it considered deterrence as an important factor in fashioning an appropriate sentence. The court wanted others to consider the ramifications of committing a crime with another person, as well as the ramifications of committing a crime involving a firearm. The court stated:

> "But given this defendant's prior criminal history, given the fact that he has been involved in criminal activity for the vast majority of his both young life and his adult life,

-13-

given the fact that he decided to arm himself with a weapon, whether or not he pulled the trigger, and decided to pound on someone's door and try to force entry, this is a crime that I believe is deterrable. This is an offense that can be deterred. Other individual[s] have to understand this over and over again."

¶ 65    The trial court entered a judgment only on count IV, a first-degree-felony-murder count, declining to enter a judgment on the remaining counts. (The trial court erred in entering a judgment on count IV, as that was not the count upon which the jury convicted defendant of felony murder. Instead, the court should have entered judgment on count V, the felony-murder charge alleging that defendant or "one for whose conduct he is legally responsible *** discharged a firearm," killing Spinks. The State concedes the error and we accept the State's concession. We remand the case with directions to amend the sentencing judgment to reflect that defendant was sentenced on count V only.) The court sentenced defendant to 60 years in prison. Defendant did not raise in a postsentencing motion the issue he raises now on appeal. However, he asks this court to review his claim under the plain-error doctrine. The first step in a plain-error analysis is to determine whether any error occurred at all. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 66    Defendant claims the trial court relied upon the facts that defendant was armed with a weapon and used force to gain entry as factors in aggravation–factors that are inherent in the underlying felony of home invasion. See 720 ILCS 5/12-11(a)(3) (West 2008). Generally, a trial court's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion. *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800. Although the maximum sentence was imposed, the trial court still sentenced defendant within the permissible statutory range of 20 to 60 years.

¶ 67    However, it is error for the trial court to consider as an aggravating factor an inherent element of the offense. *People v. Carter*, 272 Ill. App. 3d 809, 813 (1995). That is, a single factor cannot be used both as an element of the offense and as a basis for imposing a harsher sentence than would have been imposed without it. *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004). In this case, based on the totality of the court's comments at sentencing, we cannot determine that the court imposed a harsher sentence upon defendant based on the facts that he was armed with a firearm and used force to enter Spinks's apartment. Instead, it appears the court imposed the maximum sentence, in part, because the court wanted to deter others from committing a similar crime. In fact, the court specifically stated such.

¶ 68    The trial court responded to defendant's statement in allocution in which he insisted he did not intend to harm anyone and was not "the responsible shooter," yet he was found guilty of first degree murder. Defendant said he saw "the gun go off," but he "didn't pull no trigger on no man"; "didn't have no gun pointed at a man"; and "never went in the Spinks'[s] home." In referencing the elements of home invasion during its pronouncement of sentence, the court was attempting to explain to defendant that he was being sentenced on a first degree murder offense under a theory of felony murder. The mention of the elements was necessary as part of this explanation and can be characterized as nothing more. We find the court based its sentence on appropriate factors only and that given the totality of circumstances, the 60-

-14-

year sentence imposed was reasonable.

¶ 69                                    2. *Monetary Credit*

¶ 70        Defendant insists his sentencing judgment should be amended to reflect the appropriate credit and a reduction of his Violent Crime Victims Assistance Fund fine from $25 to $4. The State concedes the sentencing-judgment errors and we accept the State's concession.

¶ 71        First, the trial court awarded defendant credit for 290 days spent in pretrial custody. At the rate of $5 per day, defendant is entitled to monetary credit for those 290 days for available credit of $1,450. This credit should be applied to the fines imposed upon defendant. Second, because the court imposed more than one fine upon defendant, pursuant to section 10(b) of the Violent Crime Victims Assistance Act (725 ILCS 240/10(b) (West 2008)), the amount of the fine imposed pursuant to this act should have been $4, rather than $25. We therefore remand this case with directions to amend the sentencing judgment accordingly.

¶ 72                                    III. CONCLUSION

¶ 73        For the foregoing reasons, we affirm defendant's convictions as modified: (1) we affirm on the speedy-trial issue; (2) we remand with directions to conduct a *Krankel* inquiry into defendant's ineffective-assistance-of-counsel claims; and (3) we remand with directions to amend the sentencing judgment to reflect that (a) defendant was sentenced on count V, not count IV; (b) defendant is entitled to $5-per-day credit for the 290 days spent in pretrial custody for a total of up to $1,450 credit applied toward his fines; and (c) the Violent Crime Victims Assistance Fund fine should be reduced from $25 to $4. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 74        Affirmed as modified and remanded with directions.