2022 IL App (2d) 210421-U
No. 2-21-0421
Order filed September 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-1552 |
| | ) | |
| KAMIL KIRYAKOS YOUSIF, | ) | Honorable |
| | ) | John T. Gibbons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's preliminary inquiry into defendant's *pro se* claims of trial counsel's ineffectiveness satisfied *People v. Krankel*. The trial court was sufficiently aware of the factual basis of defendant's claim that trial counsel should have presented evidence that the police frequently harassed and abused defendant. The trial court also properly concluded that the claim had no potential merit.

¶ 2    Defendant, Kamil Kiryakos Yousif, appeals from his conviction of resisting a peace officer (720 ILCS 5/31-1(a) (West 2018)). He contends that the trial court's inquiry pursuant to the rule in *People v. Krankel*, 102 Ill. 2d 181 (1984), and *People v. Moore*, 207 Ill. 2d 68 (2003), was inadequate for it to determine whether his claims of trial counsel's ineffectiveness had potential

merit warranting the appointment of new counsel. We hold that, between the court's inquiry and the information in the trial record, the court had a sufficient basis to determine the potential merit of defendant's claims. We, therefore, affirm defendant's conviction.

¶ 3                                   I. BACKGROUND

¶ 4     Defendant was indicted on one count of aggravated battery (720 ILCS 5/12-3.05(d)(4) (West 2018) (physical contact of an insulting or provoking nature with a peace officer)) and one count of resisting a peace officer (720 ILCS 5/31-1(a) (West 2018)). On July 15, 2019, the State raised a doubt concerning defendant's fitness to stand trial. Two days later, the trial court ordered a fitness evaluation. On October 2, 2019, the court found defendant unfit, but with a probability that he would be restored to fitness within one year. The court ordered inpatient treatment. After 90 days, the court found defendant still unfit and ordered further treatment. On January 23, 2020, the court found him fit.

¶ 5     Before jury selection at defendant's April 2021 trial, the court questioned defendant about, among other things, his satisfaction with the witness list. Defense counsel—the public defender— explained that the case had arisen when two Cherry Valley police officers attempted to execute an arrest warrant on defendant stemming from a misdemeanor case. She represented that she and defendant had discussed calling witnesses from that case, but, as a matter of trial strategy, she had decided not to. Defendant told the court that, aside from a building manager whom he knew had died, he had hoped for "witnesses [who] [could] hear [him] screaming from getting beat up" by the police officers. He was not sure who those witnesses would be. He then mentioned "the neighbor's son," with whom he had conversed several times. He further suggested that defense counsel call witnesses from the grocery store where he shopped, because they knew he was a good person. Counsel replied that she and defendant had discussed the use of character witnesses. When

the court asked defendant if he had any questions for the court before trial, defendant commented that he had "been abused not only by police officers, but by some judges everywhere."

¶ 6    At defendant's trial, the State called two witnesses, Cherry Valley police officers Andy Paulson and Bryon Muraski.

¶ 7    Paulson testified that, on June 20, 2019, he and Muraski executed a warrant for defendant's arrest. They went to defendant's apartment in a 12-unit building. They announced at the door that they were police officers and had a warrant for his arrest. Defendant told them to go away and that if they intended to get him, they would have to break down his door and fight him. Paulson received clearance to force the door open, but that proved unnecessary as a property manager approached them in the hallway and provided them with a key. Paulson unlocked the door but could not open it—apparently, defendant was holding the door shut. Paulson forced the door open. Muraski went in but fell immediately. Paulson entered, and defendant punched him in the face with a closed fist. Paulson ducked, and defendant hit him a few more times before Paulson pulled him to the ground. Paulson and Muraski told defendant to put his hands behind his back; defendant did not comply. Paulson twisted defendant's wrist. Defendant then allowed the officers to handcuff him. "We got him up to his feet. Officer Muraski showed me that he had a hammer in his hand. And we escorted him out to the squad car." As they brought defendant outside, he asked to talk to a supervisor. They allowed defendant to speak to a sergeant; defendant complained that the officers injured him. After defendant was treated at SwedishAmerican Hospital, Paulson took him to jail.

¶ 8    On cross-examination, Paulson agreed that defendant frequently called the Cherry Valley police department to make complaints about the police. Paulson also noted that defendant frequently called the village hall. He agreed that, during the altercation it the apartment, he did not see defendant with a hammer. He denied that his plan before arriving at defendant's apartment was

to kick down the door. However, Paulson admitted that, before executing the warrant, a fellow Cherry Valley officer sent him a text suggesting that he kick defendant's door in, to which Paulson replied, "That's my plan." Further, he agreed that, after he arrested defendant, he participated in an exchange of texts with a detective. The detective texted, "Awesome pinch." Paulson responded, "It's a felony now he punched me in the face and head." The detective texted back, "Shit. You okay?" Paulson responded, "Oh, yeah, I'm just dandy. I love that stuff, man." The detective texted back, "Awesome." Paulson then sent a text to the officer he first texted: "Kamils [*sic*] going [redacted] he punched me in the face and head." The officer responded, "What the shit?!!" Paulson replied, "Yes sir that was fun."

¶ 9 On redirect, Paulson said that he felt "good" after he arrested defendant.

¶ 10 Muraski's testimony was largely consistent with Paulson's. He stated that he and Paulson were outside defendant's door arguing with him for 20 to 30 minutes before they got the door open. Muraski tripped on the door's threshold as he entered. He saw defendant swinging his arms at Paulson and Paulson ducking. When he and Paulson got control of defendant, he discovered a ball-peen hammer in defendant's right hand. However, defendant did not strike Muraski during the struggle.

¶ 11 On cross-examination, Muraski stated that he had had six to eight contacts with defendant before the June 20, 2019, incident. Defendant was a person who "frequently call[ed] the police."

¶ 12 The State rested at the end of Muraski's testimony. The defense moved for a directed verdict, which the trial court denied. As the court was preparing to adjourn the proceedings for lunch, defendant interjected and asked to share something he believed the court should know. The court directed him to discuss the matter with defense counsel. Defendant agreed to raise the issue later in the proceedings.

¶ 13    After the adjournment, the trial court engaged defendant in a long colloquy as to whether he would testify. Defendant ultimately decided not to testify. He said that he believed that the jury, after seeing the text messages, would understand that the officers were lying.

¶ 14    During deliberations, the jury sent a note suggesting that they were deadlocked and expressing uncertainty about the meaning of "knowing contact" for purposes of aggravated battery (see 720 ILCS 5/12-3.05(d)(4) (West 2018)). The court directed the jury to keep deliberating and provided them an additional instruction. The jury found defendant not guilty of aggravated battery but guilty of resisting a peace officer.

¶ 15    Defense counsel filed a motion for a new trial, attacking the sufficiency of the evidence and arguing that the officers' testimony was perjured. While arguing the motion, counsel alerted the court that defendant was dissatisfied with her representation because she had not called his neighbor as a witness. She defended that decision as a matter of trial strategy, but she wanted to make a record of defendant's objection.

¶ 16    The court then addressed defendant directly. Defendant claimed that he was receiving "constant harassment" from the police. Defendant also implied that his neighbor could have testified that the disorderly conduct charge leading to the warrant for defendant's arrest was an aspect of the police harassment.

¶ 17    The court tried to shift the discussion to what defendant believed defense counsel did wrong. Eventually, defendant said that he told counsel during the trial that police officers abused him at the hospital:

> "THE COURT: I, I understand. Is there, is there anything else though about your counsel's representation or is that—

THE DEFENDANT: Well, *** I was angry at Margie O'Connor [*sic*] in 2017, I'm a little bit angry at her.

\* \* \*

THE COURT: —for not calling that witness?

THE DEFENDANT: Well, not just the witnesses, the two police officers that —the lie, lie, lie. The—my attorney caught one of them—

\* \* \*

THE COURT: ***. So why you mad at her about that?

\* \* \*

THE DEFENDANT: —these two police officers lied.

THE COURT: Right. Right. I understand that but what—tell me about [defense counsel] here, specifically.

THE DEFENDANT: *** [Y]ou, as a judge, gave us, gave me several breaks to talk to my attorney.

***

THE DEFENDANT: And I was giving her information to, to mention it to the Court.

***

THE DEFENDANT: And *** I know she didn't do it on purpose or she didn't do it, she didn't do it in a mean way. I'm giving her—during the trial, I'm giving her information, the police officer abused me in the hospital. These two police officers abused me of, of violating my right. I'm giving her information to, to, to be found not guilty.

***

THE DEFENDANT: To, to share it with the state['s] attorney so they can do some investigation also. Cause I do not go in front of people, your Honor. I'm, as I told you, I'm a good Catholic."

¶ 18    After a further colloquy with defendant, the court again asked him to specify his claims against counsel:

"THE COURT: Are you alleging that your attorney did anything wrong?

THE DEFENDANT: Um, not purposely, I just don't—I cannot understand why she, she did not— *** I'm not trying to make her look bad here in court, but she did not give the Court, during the trial, the information or she did not mention anything to the jury, these [*sic*] information that I was giving it to her, telling her about the police officer, telling her about the—what these police officers did, not only in my apartment but in the hospital, I just couldn't—to this day, I do not understand why she did not mention those things."

¶ 19    The court asked defense counsel if she had any concerns about defendant's fitness. She responded that defendant was in the same condition as he was when he returned from inpatient treatment; she had not observed any deterioration. She believed that she could communicate effectively with him. The court noted that it believed that defendant understood its questions.

¶ 20    After again confirming with defense counsel that she had no fitness concerns, the court asked defendant if he had any specific complaints about counsel's performance beyond wanting her to have called his neighbor. The following exchange ensued:

"THE DEFENDANT: Well, I, um, like I said, I gave her so much information during the—getting beat up and after getting—when they—when I demanded—they were refusing to take me to the hospital because I had bruises and I was—my head was killing me from being punched, they, they said, 'Mr. Yousif we're taking you to jail right away'

and I demanded to speak to [a] sergeant and I demanded to be taken to hospital at—after the beating.

THE COURT: What, what did [defense counsel] not present that you wanted her to present?

THE DEFENDANT: The abuse by those two police officers; not only the lies, I mean, she did a good job on proving those two police officers lied but she did not mention the abuse, not—only the abuse of my civil right or my rights the abuse by those two police officers and by their—'cause several Cherry Valley been in my apartment several times different police officers."

¶ 21    After trying to summarize defendant's complaints against defense counsel, the court asked defendant if there were any other issues. Defendant said he had mentioned everything. He added that if counsel had mentioned "the important things" at trial, he would have been acquitted. The court asked if the "things" defendant referenced were those he had already mentioned. Defendant responded:

"THE DEFENDANT: Ah, yes, sir, not that the police did not mention—I did not hear them say we got a warrant because they came in with a warrant in 2018 that I violated my probation and I, I opened the door for them.

THE COURT: Okay.

THE DEFENDANT: There was no all this, you know, he attacked us, Mr. Yousif, we're here to come and get you. For what? You violated your probation and they put a handcuff on me and I—I bond out.

THE COURT: Okay.

THE DEFENDANT: There was no, he attacked us, or he did this, he did that; I've been arrested ten times, four by Rockford and I just recently got arrested again. Four by Cherry Valley and one by Loves Park when they came in with Cherry Valley.

THE COURT: Okay.

THE DEFENDANT: And they all but—I said, I refused to talk to you and the next thing I knew, one of them was a sergeant, a Loves Park sergeant, I didn't even know that.

THE COURT: All right.

THE DEFENDANT: They put a handcuff on me and I—they took me. I don't know what for—well, I know what for.

THE COURT: All right.

THE DEFENDANT: I don't, I don't attack police officers; I do not punch police officers and I've, I've had enough, it's just not right."

¶ 22    At the end of this extended dialogue, the court asked defense counsel if she wished to respond. She explained that she did not call defendant's neighbor because her investigation suggested that the neighbor's account of the incident leading to the disorderly conduct charge was consistent with police reports. Also, she did not raise defendant's claims of ongoing abuse by the police because there was a risk that the jury would find them not credible and further conclude that defendant's false belief in police abuse gave him a motive to strike the officers.

¶ 23    After hearing defense counsel, the court stated that it believed that it had "flushed [*sic*] out" all claims of defense counsel's deficiencies. The court took those issues, and the posttrial motion, under advisement.

¶ 24    At the next hearing date, defense counsel further explained why she had not sought to question the officers about their conduct at the hospital:

"[Defendant] expressed concern that I did not ask questions of the officers about what happened at the hospital *** after his arrest. The reasons for that would, would again be strategy reasons. First of all, none of the alleged events happened at the hospital. He had some concerns about the officers interfering with his treatment at the hospital, which was one of the things that he wanted me to bring up, but I found that because in the end he was transported to the hospital and he was, in fact, treated, I didn't believe that that would go towards helping his case.

I believe he also wanted me to ask the officers questions about their conduct while he was at the hospital and statements that they might have made about the, the arrest while he was at the hospital. My investigation in terms of trying to find additional information about that left me in a position where if the officers didn't testify in alignment with how [defendant] believed that they ought, I would have no options for impeachment other than to either let the issue fall flat and in front of the jury or [defendant] would be required to testify for there to be any impeachment and with it being events that all took place after the actual alleged incidents, I felt that raising that issue and creating that position where my client would have to testify when I didn't believe that it was in his strategic benefit to do so wouldn't be productive in his representation."

¶ 25    The court then concluded that it could identify three ineffective-assistance claims by defendant. First, counsel did not call defendant's neighbor, who was the complaining witness in the disorderly conduct case that resulted in the warrant for defendant's arrest. Second, counsel "did not sufficiently point out the officer[s'] dishonesty, inconsistencies, specifically lies relating to their testimony." Third, counsel failed to bring attention to the police abuse of defendant, "[n]ot

only with respect to [the] incident *** at the hospital and during the [charged] incident itself, but also a continued pattern of abuse of police power with respect to [defendant]."

¶ 26 The court explained at length that none of the claims were viable. First, the court noted that it likely would have barred the neighbor's testimony as irrelevant. Moreover, based on defense counsel's investigation and conclusion that the neighbor's testimony would have supported the State, counsel's decision not to present that testimony was "a very sound decision from a strategic and tactical standpoint." Second, defense counsel thoroughly cross-examined the police officers and effectively highlighted in closing argument the inconsistencies in their testimony and "evidence of prior dishonesty." Third, the court determined that it likely would have found inadmissible any evidence that defendant suffered past police abuse. Moreover, defense counsel made a strategic decision not to present such evidence given the risk that it could "essentially backfire *** and harm [defendant]."

¶ 27 The court also denied defendant's motion for a new trial.

¶ 28 At sentencing, defense counsel argued for a sentence of time served. She noted that defendant had a diagnosis of paranoid delusional disorder, which does not respond to medication. Defendant's persecutory beliefs were unchangeable. However, despite that condition, defendant had been compliant with pretrial services requirements. The State asked for a sentence of conditional discharge.

¶ 29 The court sentenced defendant to 301days in jail with equal credit for time served, finding as a mitigating factor that "defendant was suffering from a serious mental illness, which though insufficient to establish the defense of insanity[,] substantially effected [*sic*] his or her ability to understand the nature of his or her action to perform his or her conduct to the requirements of the law." Defendant filed a timely notice of appeal.

¶ 30                                    II. ANALYSIS

¶ 31    In *Krankel*, 102 Ill. 2d at 187-89, our supreme court established the principle that, when a defendant makes a posttrial *pro se* claim of ineffective assistance of counsel, defendant may be entitled to new appointed counsel to assist with the development of that claim. The court further developed that principle in *Moore*, 207 Ill. 2d at 77-78, holding that, when a defendant puts forward an ineffectiveness claim, *Krankel* requires the trial court to make a preliminary inquiry to determine whether the appointment of new counsel is required.

¶ 32    On appeal, defendant contends that the trial court failed to satisfy *Moore*'s inquiry requirement because it "never fleshed out the specifics" of his complaint that defense counsel was ineffective for failing to develop his claim of "a pattern of abuse by police officers." Specifically, he complains "that [defense] counsel did not bring up a pattern of 'constant harassment' by Cherry Valley police officers or that the police officers abused him and made certain statements about his arrest while he was being treated at the hospital."

¶ 33    Citing *Moore*, he argues that *Krankel* principles require a trial court to examine the factual bases for a defendant's ineffectiveness claims. For instance, he contends:

"Here, the court's questions to [defendant] and trial counsel did not advance this purpose as they never touched on the factual basis of the claims. The court did not ask the fundamental questions necessary to understand and evaluate this claim, such as: 'What specific events are you claiming the jury could find amount to "constant harassment" by the police?' 'What specifically did the police say at the hospital regarding [defendant's] arrest?' "

¶ 34    He, therefore, argues that, as "the court did not acquire sufficient information to evaluate the off-the-record claims, this case must be remanded for an adequate *Krankel* inquiry."

¶ 35    The State responds that *Krankel* principles require the court to inquire of counsel and—if necessary—the defendant as to the nature of the defendant's ineffectiveness claims. Further, under *Moore*, the court may base its determination on "its knowledge of counsel's trial performance and the insufficiency of the allegations on their face." The State contends that the court complied with *Krankel*'s requirements. Moreover, it argues that any error was harmless because the record shows that counsel had a strategic basis for the decisions in question.

¶ 36    In reply, defendant contends that the trial court's inquiry was necessarily incomplete because the court did not elicit the details of the officers' alleged abusive conduct at the hospital or the other alleged police harassment and abuse. Defendant also claims that counsel did not adequately explain the reasons for her decisions.

¶ 37    We hold that the court's *Krankel* inquiry was sufficient. First, the court had enough information about defendant's claim relating to the officers' conduct at the hospital to evaluate counsel's explanation for declining to raise the matter at trial. Further, counsel's explanation fell squarely within the ambit of reasonable trial strategy. Second, the court likewise had sufficient information from the record to evaluate defendant's claim about other police harassment and abuse. Moreover, the record makes clear why, as a matter of sound trial strategy, counsel declined to develop that claim at trial.

¶ 38    In *Moore*, our supreme court explained the *Krankel* procedure as follows:

"[W]hen a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. ***

The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. [Citation.] During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. [Citations.]" *Id.*

¶ 39    The substantive law applied in a *Krankel* inquiry is the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), for ineffective-assistance-of-counsel claims. To prevail on a claim of ineffectiveness, a defendant must demonstrate "(1) that counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). Counsel's performance is assessed using an objective standard of competence under prevailing professional norms. *Id.* "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *Id.* "As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable." *Id.*

¶ 40    A defendant may raise for the first time on appeal a claim that the trial court's preliminary *Krankel* inquiry was inadequate. See *Moore*, 207 Ill. 2d at 79 (to preserve the issue for appeal, trial

counsel need not claim in the trial court that a preliminary *Krankel* inquiry was inadequate; "[i]t would be inappropriate for trial counsel to argue a motion that is predicated on allegations of counsel's own incompetence"). Further, "[t]he issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*." *People v. Roddis*, 2020 IL 124352, ¶ 33.

¶ 41    First, we deem that the trial court sufficiently inquired into defendant's ineffectiveness claim concerning the abusive conduct of the police officers while he was at the hospital. Defense counsel explained to the court that defendant told her before trial that he wanted her to present evidence that the police had acted inappropriately while he was at the hospital. She then investigated the matter and concluded that her only choices were to cross-examine the officers or call defendant to testify, neither of which she believed were strategically sound. The clear import of this representation is that counsel had tried and failed to find an independent witness to support defendant's account of how the police acted at the hospital. Lacking such independent corroboration, counsel had limited options. She could cross-examine the officers about the hospital incident and risk that they would simply deny it and thus the claim would "fall flat." In that event, she would not want to rely on defendant to contradict their denials "when [she] didn't believe that it was in his strategic benefit" to testify at all in the case. Counsel did not expressly mention it, but undoubtedly defendant's mental-health struggles and unfocused comments in court made her question his effectiveness as a witness. Thus, counsel's decision not to raise the hospital incident at trial was a reasonable trial strategy.

¶ 42    Defendant cites four cases for the proposition that the trial court had a duty to inquire into the specifics of defendant's claim. Of the four cases, the most helpful to him is *People v. Mays*, 2012 IL App (4th) 090840. He argues that, under *May*, the court had a duty to ask questions such

as " 'What specifically did the police say at the hospital regarding [his] arrest?' " We do not read *Mays* (or the other cases) to require such questions under the circumstances here, nor do we think that such questions would have aided the court in determining whether this claim pertained only to trial strategy.

¶ 43    In *Mays*, the defendant filed a *pro se* motion alleging that defense counsel was ineffective for, among other things, sending the State a letter containing confidential information, which the State used as a basis for additional charges. *Mays*, 2012 IL App (4th) 090840, ¶¶ 36-37, 59. The trial court did not address the motion. *Id.*, ¶ 37. The reviewing court remanded for a hearing under *Krankel*. It held that a *Krankel* inquiry has two steps that must be performed in sequence: "(1) understanding the defendant's claims, and (2) evaluating them for possible merit." *Id.*, ¶ 58. It reasoned that *how* the court performs those steps is largely a matter of the court's common sense; still, unless the court understands the claims, there can be no evaluation of merit. *Id.* The *Mays* court suggested that, given the facts at issue, the trial court could not evaluate the defendant's claim without knowing the letter's allegedly prejudicial content. *Id.*, ¶ 59.

¶ 44    Given that the defendant's ineffectiveness claim in *Mays* was that the letter's content spurred additional charges, we can understand why the *Mays* court believed that the trial court needed to know that content to evaluate the defendant's claim. Here there was no similar need for additional facts. The essence of defendant's claim was evident: the officers' abusive conduct at the hospital showed their animus toward defendant. The court needed no further detail to conclude that, because the conduct occurred after the events that formed the basis of the charges, the evidence was of doubtful relevance to the case. Likewise, the court knew enough to conclude that counsel had, as noted above, a sound strategic explanation for not seeking to present evidence of

the hospital incident. "[C]ounsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable." *Ramsey*, 239 Ill. 2d at 433.

¶ 45    Second, the court did not need additional information about defendant's claim that counsel should have presented evidence of a pattern of police harassment and abuse. There was sufficient information in defendant's on-the-record allegations about such a pattern.

¶ 46    For instance, defendant made such allegations at the July 2019 hearing on the State's motion to increase defendant's bond. Part of the basis for the State's request was that defendant had allegedly escalated a practice of making unwarranted calls to the Rockford and Cherry Valley police departments and "yelling and screaming irrationally." Muraski testified at the hearing, stating that Cherry Valley police officers had repeatedly been to defendant's apartment to discuss the calls and that Muraski himself had been to the apartment for that reason six to eight times in the preceding two years. He stated that defendant also had a history of making what the police deemed to be inappropriate nonemergency calls to the police. Muraski was aware that Cherry Valley police officers had gone to defendant's apartment to urge him to stop making such calls. During the hearing, defendant interjected:

"It's about harassment by Cherry Valley, knocking my neighbor's door every day asking them if I know about money. I don't know what money they talking about. This police officer just lied next to the State Attorney's Office. Uh, they would knock on my neighbor's door. Uh, I did not threaten my neighbors. They were knocking. I was in my apartment, and I can hear them knocking my neighbor's door, African-American, does he know about, anything about the money. They came here to me several times. Not six, seven times; more than six, seven times. They were harassing me."

At the hearing, the trial court commented on its familiarity with defendant's history with the police.

¶ 47    In another example, at the March 2, 2020, hearing on the reinstatement of defendant's bond, defendant talked about police harassment. During an extended monologue, defendant stated:

> "I'm a normal person, Your Honor. I didn't move to Rockford to be destroyed, my life to be destroyed. To be look like I'm a criminal, and I'm not. Uh, this is, like I said, this is eight arrests. Arrest after arrest after arrest. I feel like three different police officers, stealing my disability. They arresting me with no crime.
>
> Loves Park and Cherry Valley came in together. One of them was a sergeant not knowing he was a sergeant. Uh, forcing himself into my apartment and arrest me. Uh, Room 315, and they dismissed that case. Uh, oops, I'm sorry, we made a mistake. But after they arrest me, destroyed my life, my fingerprints being taken, my pictures being taken as a criminal and all you say is oops, I'm sorry, we made a mistake?"

¶ 48    Similar information is found in the fitness reports. Defendant told the examining psychologist that a Cherry Valley police officer had come to his door and asked him what he was watching. Another time, Cherry Valley police officers arrived in response to a smoke alarm in the building. Defendant knew that the police had claimed that he was making unwarranted calls to the police department. When the examiner asked defendant about people in his support system, defendant answered:

> " 'There is some of them back home from my country, Iraq. There are some people from Egypt. I talk to them a little bit louder because they cannot hear me. I cannot hear them. I have to shout. Next thing I know I open my door and there is two police officers right front of my door. They have been harassing me. Knocking. My neighbor. There's a young girl cross of my fake. Excuse me, face of my door. I don't know how old is she. In the 20's I believe. Twenty two, twenty three. I can hear them, that he sexually harassed

you. Um, that's all I can hear. Cherry Valley police officers knocking my neighbor's door. Does he know about the money? I'm sittin' in my apartment and I can hear them. Um, I'm like, what money? I've been hearing that about. Not only here. I've been hearin' it way back. Does this guy know about the money? I don't know what money they are talking about. To this day I have no idea what money.' "

¶ 49 Based on the foregoing comments, and similar ones by defendant elsewhere in the record, we hold that the trial court had adequate knowledge of defendant's allegations of police harassment to evaluate his ineffectiveness claim. Thus, the court complied with *Krankel*. Moreover, it was reasonable for defense counsel to decide not to raise the issue at trial for fear that the jury would disbelieve defendant's allegations and find instead that his paranoia supplied a motive to assault the officers who were executing his arrest warrant.

¶ 50                                    III. CONCLUSION

¶ 51 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 52 Affirmed.