NOTICE
Decision filed 11/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220429-U

NO. 5-22-0429

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Richland County. |
| | ) | |
| v. | ) | No. 20-CF-46 |
| | ) | |
| KOLTON L. WISDOM, | ) | Honorable |
| | ) | Matthew Joseph Hartrich, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated battery of a child is affirmed where (1) the State's presentation of four-year-old A.W. was harmless, (2) defendant failed to demonstrate that counsel was ineffective for failing to present expert testimony, and (3) the trial court conducted a proper preliminary *Krankel* hearing.

¶ 2    Defendant, Kolton L. Wisdom, appeals his conviction for aggravated battery of a child. This case returns to this Court following a remand for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). See *People v. Wisdom*, No. 5-21-0244 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Back on appeal before us, defendant raises three issues. First, he contends that the trial court abused its discretion by allowing the State to present four-year-old A.W. as a "live-exhibit" in the courtroom during her grandmother's testimony, because her presence was irrelevant and the prejudicial effect of A.W. entering the jury

1

box and interacting with the jurors outweighed any probative value of her presence at trial. Second, defendant argues that defense counsel provided ineffective assistance where she failed to retain a medical expert to rebut the State's medical evidence and to confront the State's medical experts with relevant professional literature regarding the unreliability of shaken baby syndrome and abusive head trauma. Finally, defendant argues that he demonstrated that defense counsel neglected his case during the *Krankel* inquiry. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On or about February 11, 2020, the State charged defendant by information with aggravated battery in violation of section 12-3.05(b)(1) of the Criminal Code of 2012. 720 ILCS 5/12-3.05(b)(1) (West 2018). The information alleged that, on or about February 6, 2020, defendant committed a battery and knowingly and without legal justification caused great bodily harm to A.W., who was a child under the age of 13, in that defendant shook or threw A.W., causing brain damage.

¶ 5    Defendant proceeded to a jury trial beginning on June 14, 2021. Following jury selection, the State presented its evidence. Prior to the jurors arriving, defense counsel brought to the trial court's attention that the State intended to have the minor victim, A.W., brought in and identified by their first witness. Defense counsel objected to this based on "relevance." Defense counsel argued that she did not believe that "having that witness identify the minor is relevant in this case." Rather, "it would be done to elicit sympathy from the jury and that it would be prejudicial to my client."

¶ 6    The State responded and argued that the jury viewing A.W. was "a cornerstone of this case." The State explained that she was "the child that will be discussed at length in this case" and

2

it was important for the jury to see "her injuries now and what she's facing." The trial court overruled the objection and allowed the State to proceed.

¶ 7    Following opening statements, the State proceeded with their first witness, Heather Curtis. Curtis testified that she had one grandchild, A.W., born on December 14, 2016. A.W. was the daughter of Curtis's son, Dylan Willard, and Jasmine Parrish.

¶ 8    A.W., Dylan, and Parrish lived with Curtis from the time of A.W.'s birth until November of 2019. Curtis testified that while A.W. resided in her home, A.W. was a "typical baby." Following Dylan and Parrish breaking up, Parrish and A.W. moved in with Parrish's sister, her sister's boyfriend, and defendant. A.W. and Parrish resided at her sister's residence for approximately one month. Parrish and defendant then moved into an apartment in Noble, Illinois, with A.W. During this time, Parrish and Dylan were in a custody dispute.

¶ 9    Curtis was aware that Parrish was in a dating relationship with defendant. Curtis was "worried" about defendant babysitting A.W. while Parrish worked. Curtis saw A.W. on January 1, 2020, when Curtis was "given short notice" to meet A.W. at the park. Curtis and Dylan, along with other family members, "rushed at the opportunity to see her" at the park. They visited with A.W. for approximately an hour and a half. Parrish and defendant remained nearby, playing basketball.

¶ 10    Curtis saw A.W. on January 26, 2020, at a Mexican restaurant. Curtis observed a "goose egg" on A.W.'s forehead. A.W. also had a bruise on her cheek. A.W. had a phone and she "brought it up to her face really close to see it." Curtis's husband advised Parrish that it seemed that A.W. had an issue with her vision. Parrish indicated that she would take care of it. Curtis never noticed A.W. had vision difficulties prior.

¶ 11    Parrish allowed Curtis to take A.W. home with her that same day. A.W. stayed with Curtis and Dylan until January 29, 2020. A.W. became ill while staying with Curtis. Curtis took A.W. to

3

Carle Convenient Care on January 29. While at the doctor's office, Curtis expressed concern to care providers about bruises on A.W.'s cheek, chin, thighs, and feet. The physician "called it in" to the Department of Children and Family Services (hereinafter "DCFS").

¶ 12 Curtis received a call from a DCFS investigator on February 5, 2020. On February 6, 2020, Dylan received a phone call saying that A.W. was hurt and on the way to the emergency room. Curtis, Dylan, and Curtis's husband, went straight to the emergency room. Curtis observed A.W. being removed from the ambulance. A.W. was pale and bruised. A.W. was transferred to Carle Hospital in Champaign. Upon her arrival at Carle, A.W. received emergency brain surgery, because her brain was swollen. At the end of February 2020 A.W. was transferred to Ranken Jordan, a rehabilitation hospital for children. Curtis and Dylan took shifts staying with A.W. Curtis testified that defendant did not come to the emergency room, although Parrish "eventually" arrived.

¶ 13 The State introduced People's Exhibit 1, photos that Curtis took on February 7, 2020, of A.W. Curtis described the photo, noting that A.W. had a bandage on her skull, along with a drain "so that any blood or anything will come out and not sit there." A.W. was on a ventilator for breathing purposes. A.W. had IVs, a blood pressure cuff, heart monitor, and catheter. A.W. was in a medically induced coma at this time. State's Exhibit 2 was a similar photo which demonstrated that A.W. had a feeding tube.

¶ 14 The State introduced People's Exhibit 3, a photo taken approximately a week after the incident. A.W. was not covered in blankets, as she had a fever and needed cooling blankets. Her head bandage was removed, and stitches were visible on her skull. People's Exhibit 4 was a photograph depicting the skull fracture which was sutured shut.

4

¶ 15    On February 14, 2020, A.W. began to open her eyes. People's Exhibit 5 was a photo of A.W. with her eyes open, holding hands with Dylan. Curtis testified that A.W. was not able to use her right arm. Prior to the incident, A.W. did not have any mobility issues with her right arm. At the time of Curtis's testimony, A.W. still did not use her right arm. A.W. suffered a stroke immediately following the incident, which impacted mobility on her right arm.

¶ 16    Curtis testified that A.W. required physical therapy, occupational therapy, and speech therapy three days per week. A.W. attended a special education preschool, where she received additional therapies. A.W. required future surgeries, including another brain surgery and plastic surgery.

¶ 17    The State introduced People's Exhibit 6, a photo of A.W. with Dylan. The photo was taken at the end of February 2020 when A.W. transferred to Ranken Jordan. A.W. was in a customized wheelchair. A.W. wore a helmet to protect her brain. At Ranken Jordan, A.W. received physical therapy, occupational therapy, and speech therapy, "basically daily."

¶ 18    The State introduced People's Exhibit 26, a photo of A.W. and her grandpa, Curtis's husband. The photo was taken before the injury, around October of 2019. In the photo, A.W. held a sippy cup with her right hand. Curtis testified that prior to the incident, A.W. was right-handed. However, after the incident, A.W. could only use her left hand.

¶ 19    Upon her release from Ranken Jordan on April 23, 2020, A.W. resided with Curtis and her son, Dylan. At the time of trial, A.W. was four years old. A.W. attended elementary school in the special education program. Curtis testified that A.W. was "not the same" following the incident.

¶ 20    Following this testimony, the State asked for the witness to identify A.W. The following took place:

> Q. Heather, is [A.W.] in the courtroom today?

THE MINOR, A.W.: Hi, Grammy.

A. That's my [A.W.]

Q. Could you please identify her by an article of her clothing?

A. I'm sorry?

Q. Could you please identify her by an article of her clothing?

A. I see her with love on her—on her dress.

THE MINOR, A.W.: Hi.

[The State]: Your Honor, if the record could reflect [A.W.]'s in the courtroom.

THE COURT: The record will reflect identification.

[The State]: Thank you.

THE COURT: Let's keep her back away from the jury.

THE MINOR, A.W.: Hi, Grammy.

THE WITNESS: Can I have a big kiss? No kisses?

THE COURT: Mr. Willard, if you'll get her.

[The State]: Your Honor, the State would rest with Heather Curtis.

[Defense Counsel]: May we approach, Your Honor?

THE COURT: Yes.

(Off the record discussion.)

¶ 21    Following a lunch recess, defense counsel stated:

[Defense Counsel]: Yes, Your Honor. I would just ask the court—before we broke, we were ending with the testimony of Heather Curtis, and the minor, [A.W.], came in and was identified. And just so that we have a clear record, I would just ask the court—and, Your Honor, if you might just state briefly what you witnessed when the minor came in.

THE COURT: Okay. What happened was I believe she was brought in by her father, Dylan Willard. I think he was trying to walk her over, and she indicated,

6

physically, it appeared to me, that she wanted put down. So he put her down, and she walked over towards the witness, and was identified by the witness. After she was identified, she did walk over towards the jury box and walk around the jury box. And I believe that—in order to avoid any type of inappropriate sympathy, I requested the father to get the minor child and take her back because the occasion had already occurred.

¶ 22    The court asked defense counsel whether he offered "an accurate summary." Defense counsel indicated that the court's observations were correct.

¶ 23    The State next called Loren Damien Wingert. Wingert worked for Carle Arrow Ambulance in Olney, Illinois, as a licensed paramedic. Wingert responded to a call in Noble, Illinois, for a three-year-old female "who fell out of the tub" and was "not acting appropriately." When Wingert arrived on-scene, defendant was present with A.W. A.W. was "lying just inside the door on the couch" in the living room "wrapped up in a blanket." Wingert observed "a number of bruises and two hematomas on her head." One hematoma was above the right eye, and one was on the back of the head on the left side. Wingert explained that a hematoma "is similar to a bruise with associated swelling." A.W. was "unresponsive" to first responders.

¶ 24    Wingert testified that defendant reported that the "puppy at the residence knocked her over causing her to fall, bump her head, and she began not acting right." Wingert described defendant as acting nervous and anxious. Defendant "was pacing, kind of running his hands through his hair, and sweating very profusely for it being a February day."

¶ 25    Wingert obtained vitals from A.W. A.W. had a dilated left pupil and a constricted right pupil. Winger testified that unequal pupils were indicative of neurological injury. A.W. began having "seizure-like activity" and "posturing." Wingert explained that posturing "is also indicative of neurological injury." Wingert testified that when posturing occurs, the body will curl inward on itself. Wingert requested the sheriff's office to respond, and Wingert moved A.W. to the ambulance.

¶ 26    In the ambulance, Wingert placed an IV and a ventilating bag valve mask. First responders administered medication to relax A.W.'s airway in order to maintain an open airway for A.W. Wingert observed other injuries on A.W.'s body, including bruises on the right temple, pelvic arches, tops of feet, and palms of her hands. Wingert prepared a report in reference to his response, and he also prepared a diagram showing the injuries to A.W.'s body, which the State introduced as People's Exhibit 7.

¶ 27    Wingert returned to the residence "in anticipation of finding one of the two deputies on scene to discuss [A.W.]'s presentation, her injuries not lining up with the story that we were provided." Upon arriving inside, Wingert only observed defendant. Defendant was in the bathroom "kneeling by the toilet, crying and dry heaving into the toilet bowl."

¶ 28    On cross-examination, Wingert testified that Parrish arrived around the same time that emergency responders arrived. Parrish rode in the ambulance to the hospital with the first responders.

¶ 29    The State next called Robert Sakowicz. At the time of the offense, Sakowicz worked as a general investigator at the Richland County Sheriff's Office for approximately five and a half years. Sakowicz was the investigator for A.W.'s case. Sakowicz responded to the scene of the incident. Upon arrival, the ambulance crew was on scene "carrying a young girl out of the residence and to the ambulance." Sakowicz entered the ambulance "to see the status of the child" and he observed her in distress with "bruising over a large portion of her body" including "her face."

¶ 30    Sakowicz entered the residence with Captain Mike Bertin to speak to the subject inside of the home. Sakowicz contacted defendant, who advised him that he was preparing a bath for A.W., and A.W. was pushed over by a dog. As a result, A.W. "fell over and hit her head on the bathtub."

8

Defendant advised Sakowicz that A.W. hit the back of her head, not the front of her head. Sakowicz testified that there was a dog in the home, but the dog did not jump on anyone during the investigation.

¶ 31 Based upon his observations and experience, Sakowicz testified that defendant's story was not consistent with the scene. Sakowicz testified that "the amount of bruising that I observed before I even started talking to him, that was more bruising than I have ever seen on any children that I have come into contact with during my work or at any other point in time during my life." Moreover, Sakowicz did not believe the "pain and distress that [A.W.] appeared to be in in the ambulance" was indicative of a "simple fall back from being pushed over" as defendant described. Upon obtaining a warrant, Sakowicz took photographs of the home. Sakowicz also subpoenaed Facebook records for the accounts of defendant and Jasmine Parrish.

¶ 32 The State next called Captain Mike Bertin from the Richland County Sheriff's Office. Captain Bertin dispatched to a 911 call in Noble, Illinois, for "a small child that wasn't acting right." Upon his arrival, Sakowicz was present at the scene. The ambulance crew informed Captain Bertin that "the child was covered in bruises and that the male babysitter was still inside and throwing up into the toilet." Captain Bertin did not talk to defendant, and Captain Bertin did not observe the child. Captain Bertin observed a dog in the home, and he testified that it was "small" and "about a foot tall." Captain Bertin testified that the dog did not jump on anyone in the home that he could recall.

¶ 33 Captain Bertin drove the ambulance to the hospital. Captain Bertin testified that he observed the child upon arrival at the hospital. Captain Bertin observed "more bruises on her body than I've ever seen on anybody." Specifically, Captain Berin observed "bruising on top of her feet"

9

which was "an odd place to bruise." On cross-examination, Captain Bertin testified that Jasmine Parrish was also arrested.

¶ 34 The State next called William Jennings. Jennings worked as a registered nurse in the emergency room at Richland Memorial Hospital. On February 6, 2020, Jennings provided treatment to A.W. Jennings prepared a medical record documenting his findings and care. Jennings testified that such a record is normally kept in the course of nursing. The State introduced People's Exhibit 23, a copy of the emergency department record for A.W., prepared by Jennings. In the report, Jennings noted that there was evidence of abuse or neglect, and that the patient was in "severe distress." Jennings reported that there "were multiple bruises to the feet, hands, head, hips, and thighs." Jennings photographed the bruises, which were admitted as People's Exhibits 13 through 17, with no objection from defendant.

¶ 35 Jennings testified that upon A.W.'s arrival to the hospital, there was "no response from the patient" based on a lack of eye activity, verbal activity, and motor activity. Jennings testified that this suggested life-threatening seriousness. Jennings testified that based on his experience, it was his opinion that the injuries were intentionally inflicted upon A.W. Jennings based his opinion on the bruising on A.W.'s body. He also noted that A.W. presented with "posturing" which was indicative of a traumatic brain injury. On cross-examination, Jennings testified that he was unable to determine the age of the bruises on A.W.'s body. Defense counsel also got Jennings to admit that he could not make a "judgment call" on how A.W. received the injuries.

¶ 36 The State next called Sergeant Andrew Smith from the Illinois State Police. At the time of the incident, Sergeant Smith was the commander over the Child Death Investigative Task Force in the Violent Crimes Unit. Detective Sakowicz reached out to Sergeant Smith regarding A.W.'s case. Sergeant Smith sent crime scene investigators to the scene, and Special Agent Tim Brown

10

and Special Agent Travis Rinehart responded to assist with interviews. Sergeant Smith assisted Detective Sakowicz with a forensic examination of defendant's cell phone, and he assisted with the search warrant for Facebook records.

¶ 37    Sergeant Smith testified about Facebook messages sent between defendant and Jasmine Parrish. On January 3, 2020, defendant sent Parrish a message that said "I just had to beat your child. I apologize but she was screaming no, no, no because she didn't want a bath." Parrish responded to defendant's message, and defendant said, "I was going to record you and show you because she was just throwing a fit and kicking and screaming. I whipped her pretty hard, baby. I don't think she'll do it again." In another message to Parrish, defendant said, "Bro, your kid is the spawn of Satan." On January 4, 2020, defendant sent Parrish a message that stated, "she's possessed by Lucifer himself." On January 4, 2020, Sergeant Smith testified about the following Facebook message exchange between defendant and Parrish:

> "Starting at the top here, Kolton sends Jasmine a message at 3:06 that says, She pooped. And Jasmine—and then Kolton—let me back up. Jasmine sends a message, She pooped. Kolton responds, Oh, do you need a diaper? Then Kolton responds, Make sure her butt is okay, too. Jasmine states, Yes, I do. And her butt looks bad. Kolton says, I know the red marks on the inside of her cheeks are from— if from sitting on the broccoli, though. I'll be there in a lil. Sorry, babe. Kolton again states, I told her I was sorry, babe. I'm saying sorry to you, too, though. She was acting ridiculous though. Jasmine responds, I believe you, but she cannot have marks on her. That's why she has to have a diaper or you put her in time out. She'll be fine though. And Kolton responds, I know she can't, and it's not fine though. I really feel bad. Kolton further states, Please don't leave me. Jasmine responds, Baby, I'm not mad. I'm not gonna leave. Kolton replies, I'm mad. Jasmine replies, Why, baby? And Kolton states, I shouldn't have let her make me mad like that. You say it all the time. She's only three. Jasmine states, I get mad at her, too. Jasmine states, Where are you? Kolton states, Yeah, but you don't beat her. And I'm still at the gym, baby. Kolton states, I have Mace—I'm—I have Mace I ride I'm waiting for him to finish up. And I don't literally beat her."

11

¶ 38    Sergeant Smith also testified about text messages recovered from defendant's phone. On January 15, 2020, Sergeant Smith testified that the following text message exchange occurred between defendant and Parrish:

> "Jasmine tells—states to Kolton, Don't be rude. Kolton responds, I might kill your kid. Jasmine responds, What's wrong? Kolton states, Just not being an ass fuck LOL. Jasmine states Oh my God. Kolton responds, She's ridiculous sometimes. Jasmine states, I know she is, baby. Kolton states, She jumped on me and her mouth hit my head, so her lip is swollen again."

On January 16, 2020, defendant sent Parrish a text message stating, "Send me a voice message if you telling [A.W.] to go potty or you might have a dead child."

¶ 39    The State next called Jasmine Parrish, A.W.'s mother. Parrish testified that she had one child, A.W., who lived with her dad, Dylan, in Olney, Illinois. Parrish testified that prior to the fall of 2019, A.W. was "happy all the time" and enjoyed playing with other children. In November 2019 Parrish moved out of the home she shared with Dylan and his parents following their break up. Parrish and A.W. moved in with Parrish's sister for approximately one month.

¶ 40    Parrish moved to Noble, Illinois, with A.W. and defendant was "staying there" "[p]retty much all the time." Parrish worked at Emerald Glen full-time as a CNA. Defendant did not work, and he watched A.W. while Parrish worked. Defendant communicated with Parrish through Facebook messenger or text message while she was at work.

¶ 41    Parrish testified that defendant spanked A.W. as discipline. Parrish "didn't think spanking was a very good option." Parrish testified that defendant spanked A.W. during the process of potty training if A.W. had an accident. Parrish testified that she was not aware of defendant being physical with A.W. outside of spanking. Parrish "was trying to get him to watch her a little bit carefully so she wouldn't have this happen to her."

¶ 42   Parrish testified that there were concerns about A.W.'s vision. A.W. had a vision test at her daycare, which indicated that A.W. needed glasses. Parrish set up a vision appointment for A.W.

¶ 43   On February 6, 2020, Parrish was scheduled to work from 11 a.m. until 7 p.m. After oversleeping, Parrish "rushed to get ready and leave" for work. Around 1 p.m., defendant called Parrish "panicking." Defendant told Parrish that she "needed to leave work and come home immediately" because A.W. "wasn't acting right." Defendant video called Parrish, and Parrish observed defendant "holding her in his arm, and she just kind of fell over, like, her head was just kind of limp and she wasn't moving." Parrish left work and called an ambulance.

¶ 44   Parrish arrived home at approximately the same time that the ambulance arrived. Parrish entered the home and observed defendant carrying A.W. and placing her on the couch. A.W. appeared to be having a seizure. Parrish testified that A.W. was "jerking a lot" and "just was staring." Parrish testified that A.W. was either in a diaper or only in a towel, because she got a bath. Parrish testified that it was not normal for A.W. to take a bath at this time of day.

¶ 45   Parrish testified that she and defendant recently got a puppy. She testified that the puppy was a Blue Heeler, and it was not very excitable. Parrish testified that the puppy was shy and skittish.

¶ 46   The EMTs moved A.W. to the ambulance and offered Parrish to ride in the ambulance with A.W. Parrish was not advised about the extent of A.W.'s injuries until the following day. Parrish "knew that she had a seizure and her brain was swelling." However, she did not know until the day after the incident "that her skull was fractured." Most communication from hospital staff went to Dylan and his family.

13

¶ 47   Parrish testified that she had criminal charges pending against her for aggravated assault based on a theory of accountability stemming from the injuries to A.W. The State did not make any promises to Parrish for her testimony.

¶ 48   Parrish testified that she observed defendant get frustrated with A.W. She observed him "spank her" "with a diaper on." She did not observe defendant "hit her" "in the face or any of that." Parrish testified that there were instances where defendant would tell her by either text message or Facebook messenger that A.W. had a fall or an accident. Parrish testified that there was an instance where defendant said that A.W. used the bathroom and fell off the toilet. A.W. allegedly hit her face on a space heater in the bathroom, and A.W. had a bruise below her left eye.

¶ 49   From the time A.W. was born until November 2019 Parrish testified that A.W. was not frequently bruised. From November 2019 through February 2020 Parrish testified that there were more bruises on A.W. On February 6, 2020, Parrish testified that A.W. had a "busted" lip "from a fall he said she had." Parrish testified that if A.W. "had a bruise or something had happened, [defendant] always, like, was able to tell me what exactly had happened, and I just believed what he said."

¶ 50   Parrish read the above-referenced text messages and Facebook messages, and she testified that at the time she received the messages, she did not think that defendant "was being serious." However, at the time of trial, Parrish testified, "I think he was being serious." On cross-examination, regarding the text messages and Facebook messages, Parrish testified that she believed defendant was joking or being sarcastic in his messages about A.W.

¶ 51   The State next called Dr. Peter McCool, an emergency medicine physician. Dr. McCool was qualified as an expert witness with no objection from defense counsel. Dr. McCool treated A.W. on February 6, 2020, at Richland Memorial Hospital. A.W. arrived in critical condition. She

14

received a CAT scan at the hospital, which showed a left hemispheric subdural hematoma. Dr. McCool testified that A.W. was deemed "critical" because "of the extensive brain injury found in the CT scan[,]" and "extensor posturing, which signifies significant neurological injury that's typically immediately preceding death." A.W. had "fixed and dilated" pupils which was "generally an early sign that the brain is being actively squeezed out of the skull because of pressure, usually due to bleeding" and "injury."

¶ 52 Dr. McCool noted bruising to the chin, bruising to the right, central forehead, and a large hematoma on the back of A.W.'s skull. There were injuries to both the front of the forehead and the back of the head. Dr. McCool noted in his report that the injuries were due to "non-accidental trauma." Specifically, Dr. McCool noted that the hematoma to the back of the head "could happen" if a dog jumped on a child. However, the bruise on the chin and bruise on the forehead "would not be consistent with a dog jumping on a child and knocking the child over."

¶ 53 On cross-examination, defense counsel adduced that the hematoma to the front of the head on the right forehead was not a fresh hematoma. Dr. McCool testified that the bruises on A.W.'s body were in various stages of healing. Defense counsel established that the bruise on the chin likely happened at a different time than the bruise on the forehead. Dr. McCool noted that A.W. had a hematoma on the back of her head that appeared to be fresh. Dr. McCool testified that either the injury to the chin or the back of the skull could have caused the bleeding to the brain. Dr. McCool testified that A.W. never had a skull fracture. Turning to the bruises on A.W.'s hands and feet, Dr. McCool testified that the bruises were in various stages of healing and most likely did not occur on February 6.

¶ 54 The State next called Dr. Balasubramanyan Napa, a pediatric intensive care physician. Dr. Napa was qualified as an expert witness in the "field of medicine" with no objection from defense

15

counsel. Dr. Napa treated A.W. at Carle Hospital in Urbana, Illinois. Upon A.W.'s arrival to Carle, she was "comatose" with "breathing tubes" and "asymmetric pupils." Dr. Napa explained that this occurs when there is "pressure inside the skull[,]" which resulted in A.W. requiring a "decompression craniectomy." A surgical team removed part of the skull in order to relieve pressure. Dr. Napa "received" A.W. following her surgery. Dr. Napa observed bruises on A.W.'s body and noted that A.W. was "unresponsive in a coma."

¶ 55    After approximately one week, Dr. Napa testified that A.W. improved with movement on her left side and occasionally opened her eyes. However, the pupils remained asymmetric, and A.W. still had "significant swelling." A.W. remained on a ventilator. Dr. Napa's report noted that A.W.'s injuries were "consistent with nonaccidental trauma." He testified that DCFS was aware, and a child abuse team would follow up.

¶ 56    Dr. Brent Reifsteck, a pediatric hospitalist at Carle Hospital in Urbana, Illinois, next testified. Dr. Reifsteck was qualified as an expert witness in the field of medicine, specifically pediatrics, with no objection from defense counsel. Dr. Reifsteck examined A.W. on February 7, 2020. He determined that A.W. suffered "a case of abusive head trauma" which was an "inflicted injury." Dr. Reifsteck based this determination on A.W.'s bruising, "retinal hemorrhages in the backs of her eyes," and "subdural hemorrhage inside her skull." Dr. Reifsteck also testified that the "history in this case" did "not match the injuries."

¶ 57    To determine whether A.W. suffered from abusive head trauma, Dr. Reifsteck testified that a study recommended that physicians look at six criteria: "apnea or cessation of breathing, seizures, bruising, retinal hemorrhages, long bone fractures, and rib fractures." Dr. Reifsteck testified that four of the criteria were present in A.W.'s case. Dr. Reifsteck testified that the study was "duplicated or replicated" with more specific criteria in 2018, which set forth seven criteria:

"respiratory compromise, hypoxic brain ischemic encephalopathy, subdural hemorrhage, abnormal skeletal survey, abnormal retinal exam, complex skull fracture, and bruising in the—on the torso, ears, or neck." Of the seven criteria, Dr. Reifsteck testified that A.W. exhibited five. Therefore, Dr. Reifsteck testified that there was a 99.99% chance that her injuries were sustained from abusive head trauma.

¶ 58    Turning specifically to retinal hemorrhages, Dr. Reifsteck testified that an ophthalmologist examined A.W.'s retinas. The ophthalmologist determined that there were retinal hemorrhages in the back of the eye "that were extensive in all of the layers of the retina" and "too numerous to count" in both eyes. Dr. Reifsteck testified that "we really do not see that in medicine outside of abusive head trauma." He testified that retinal hemorrhages may happen in children from motor vehicle accidents, but not from "short falls."

¶ 59    Dr. Reifsteck also based his conclusions on the bruising on A.W.'s body. He testified that A.W. had approximately 12 bruises on her body, and some of the bruises were in locations that are suspicious for abuse such as the neck and torso.

¶ 60    On cross-examination, defense counsel established that Dr. Reifsteck was not a "treating physician" for A.W. Rather, he was a consulting physician who reviewed what other physicians have done, and he formed his opinion based on that. Defense counsel established that retinal hemorrhaging could occur outside of abusive head trauma. The following exchange occurred:

> Q. So I guess just to—in simple terms, you can't say what happened to her?
>
> A. Yeah. I can't say exactly what happened. All we know is this, you know, matches up with known—you know, known observed or recorded events that are abusive head trauma, and, you know, matches up with our scientific published papers that indicate that.
>
> Q. Okay. But there would be instances of causes of an accidental injury— that a person could have injuries like [A.W.] that would not be intentional. It's possible?

17

A. It's possible. Yeah."

¶ 61    Following Dr. Reifsteck's testimony, the State rested. Following admonishments, defendant testified. Defendant testified that he fathered twins when he was 16 years old. Defendant and the mother of his twins broke up after approximately three years together, and defendant had limited contact with his twin daughters. Defendant did not graduate from high school.

¶ 62    Defendant and Parrish had a brief high school romance. The two reconnected around November of 2019. Defendant began to babysit A.W. while Parrish worked. At the time, A.W. was three years old and potty training. Defendant testified that it was "frustrating at points." Regarding the text messages, defendant said that he "didn't mean" them. Defendant testified that he spanked A.W. on "[n]o more than four" occasions, however, he left a mark on at least one occasion.

¶ 63    On February 6, 2020, defendant testified that he woke up around 8:30 in the morning. Parrish was still asleep, and she ultimately received a phone call around 11:30 in the morning that she was late for work. Parrish rushed to work. Defendant stayed home with A.W. He told A.W. to clean her room, and around 1 o'clock in the afternoon, defendant ran A.W. a bath.

¶ 64    Defendant and Parrish recently adopted a blue heeler puppy, which was "[n]ot a very big dog." While getting A.W. ready for her bath, the dog entered the bathroom. The dog jumped on A.W. which defendant described as "just a little hop." A.W. "kind of fell back and hit her head" but defendant was not concerned. A.W. did not react, nor did she cry. Defendant placed A.W. in the bathtub and left the room to get something to eat. Defendant testified that he was gone for approximately thirty seconds. When defendant returned, he noticed that A.W. was not responsive to him. He testified that her eyes were not focused, and she went "limp in the tub." Defendant removed A.W. from the bathtub, and he believed she may be having a seizure.

¶ 65    Defendant testified that he called Parrish, and then video called her, to advise her of A.W.'s condition. Parrish told defendant to take A.W. to the hospital. Defendant testified that after getting off the phone, he tried to get A.W. to relax, however, her lips turned blue and she continued to seize. Defendant did not call 911. Defendant testified that he knew that an ambulance was on the way. In approximately 15 to 20 minutes, an ambulance arrived.

¶ 66    Defendant was "worried sick" and almost threw up in the bathroom. He remained in the home with law enforcement. Defendant told law enforcement "what happened" and gave them his cell phone. Defendant went to the police station. Defendant remained at the police station for approximately four hours.

¶ 67    Defendant testified that A.W. obtained a bruise on her forehead from falling off the toilet. Defendant testified that the bruise on A.W.'s chin occurred when "she was running out of the room and hit her foot on the edge of the doorway and just kind of, just biffed it." Defendant indicated that this occurred three or four days prior to the incident. Law enforcement took defendant to a friend's house. Defendant called Parrish, who advised that A.W. was in surgery. Defendant testified that he cried as he spoke to Parrish, "and that was the last time I ever talked to" Parrish. Defendant tried unsuccessfully to contact Parrish in the days that followed.

¶ 68    Defendant testified that he had no phone, no car, no job. He returned to his parents' home in Indiana. From there, defendant went to North Dakota to stay with his sister and grandma. Defendant was ultimately arrested in North Dakota.

¶ 69    On cross-examination, defendant testified that he said things that he did not mean but he would "never overreact" in a "violent way." Defendant testified that he did not recall seeing bruising on A.W.'s body. Defendant stated that he got "frustrated" while babysitting but would

19

"vent" to Parrish through text message. The State confronted defendant with his text and Facebook messages. Defendant rested, and the State offered no rebuttal.

¶ 70    Following jury instruction conference, attorneys proceeded to closing argument. Relevant to this appeal, defense counsel argued that the jury's task was to determine whether defendant inflicted great bodily harm to A.W. on February 6, 2020. Specifically, defense counsel argued that the jury should focus only on the brain bleed and not on any bruising on A.W.'s body that took place in "separate incidences." Counsel argued that defendant was "not on trial for those bruises." Rather, counsel focused on the "hematoma on the back of her head" that occurred on February 6.

¶ 71    Turning to the head injury, defense counsel argued that the State failed to prove that defendant "knowingly did something to" A.W. Counsel argued: "we haven't heard any evidence from anyone that [defendant] did anything. Nobody said he threw her. Nobody said he pushed her. I mean, nobody said what he did because he didn't do anything." Counsel argued that defendant cooperated with law enforcement and willingly gave them his phone.

¶ 72    Counsel argued:

> "She fell and she hit her head on the bathtub. You've heard no other evidence or no other explanation at all all week from anyone explaining how this happened. What they're doing is they're looking and they're saying, well, he sent those text messages and she had those bruises, so this isn't an accident. But they didn't tell you what it did, what it was then."

¶ 73    Following arguments, the trial court instructed the jury. The jury returned a verdict of guilty for aggravated battery of a child.

¶ 74    Defendant filed a motion for judgment notwithstanding the verdict or a new trial. Relevant to this appeal, the motion for a new trial alleged that the trial court erred by allowing A.W. to enter the courtroom during the testimony of the State's witness, Heather Curtis, over objection of defendant, and defense counsel erred by failing to obtain an expert to testify on behalf of defendant.

20

Turning to his argument related to A.W., specifically, the motion indicated: "when the minor child was brought into the court room over the defendant's objection, the minor child was allowed to walk up to the witness on the stand and interact with the witness and the child walked into the first and second row of the jury box interacting with multiple jurors, which caused undue prejudice to the defense in this case and barred the Defendant from a fair and impartial trial."

¶ 75    The trial court held a hearing on the motion. Defense counsel stood on her motion. The trial court denied the motion. Relevant to this appeal, regarding A.W. interacting with the jury, the trial court stated, "the Court immediately ended any interaction as quickly as possible, and I believe there was a record concerning what happened." Regarding defense counsel failing to obtain an expert witness, the court stated that this was "trial strategy of the defendant."

¶ 76    On July 29, 2021, the trial court sentenced defendant to 30 years in prison. On August 5, 2021, defendant filed a motion to reconsider sentence which was denied the same day. On August 10, 2021, defendant filed a timely notice of appeal.

¶ 77    Defendant appealed, arguing before this court that defense counsel's motion to reconsider contained an allegation that defendant claimed that counsel had rendered ineffective assistance by failing to obtain an expert medical witness to testify on his behalf. The motion was denied following a hearing and defendant appealed. See *People v. Wisdom*, No. 5-21-0244 (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court granted defendant's motion for summary relief and remanded to the trial court for a preliminary inquiry into his claims of ineffective assistance of counsel. *Wisdom*, No. 5-21-0244 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 78    On May 24, 2022, the trial court conducted a preliminary *Krankel* hearing. The trial court noted that it "reappointed" defense counsel for the preliminary hearing "to make a determination

21

as to whether or not additional counsel should be appointed on the issue." Defendant first argued that defense counsel failed to obtain a medical expert on his behalf. The court asked defense counsel whether she discussed obtaining an expert witness with defendant. Defense counsel stated, "it was something that me and [defendant] did speak about a couple different times, and, ultimately, as part of the trial strategy, I did not think in the end when we went to trial that it was necessary to have a medical expert." Defense counsel continued:

> "[T]he fact of what the injuries were I didn't feel like was in question or what was contested. The injuries were what they were. It was not did that injury occur, and I didn't believe that an expert—because there was no way to determine how the injury occurred, and I felt like if we attempted to obtain an expert, it might not have gone favorably, then that was—we'd have to disclose that to the State, and that it could possibly be something that backfired."

¶ 79 Defense counsel further elaborated:

> "I felt like with cross-examination of the medical doctors and some of the other people that the State put on, we were able to bring out that they couldn't determine what caused the injury either, which would essentially be the same thing if we put on an expert as well, and that—sometimes I think it's better when you have a jury if you don't—if it's not the same thing over and over and over again."

¶ 80 Defendant had no other allegations of ineffective assistance. The trial court noted that it intended to review case law and the transcripts concerning the medical testimony. The court took the matter under advisement and noted that it would "issue a written ruling through docket entry."

¶ 81 On June 21, 2022, the trial court entered an order on defendant's claim of ineffective assistance of counsel by docket entry. The docket entry stated:

> "The Court questioned Defendant concerning his claims of ineffective assistance of counsel at the preliminary *Krankel* hearing conducted on May 24, 2022. Defendant claims that his attorney was ineffective because she failed to secure a medical expert to testify on his behalf in his case. His attorney asserted that this was a matter of trial strategy and that she was concerned that having another medical expert review the medical information could result in another medical expert testifying against her client rather than in her client's favor.

22

Even in a preliminary *Krankel* inquiry, the Court is allowed to consider the merits of Defendant's claim in its entirety. *People v. Roddis*, 2020 IL 124352, 161 N.E. 3d 173, 182-83 (2020). Furthermore, the decisions as to which witnesses to call and what evidence to present are trial strategy decisions that are normally immune from ineffective assistance of counsel claims. See *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (1st Dist. 2005). Failure to call an expert witness for Defendant is not *per se* ineffective assistance of counsel. *Id.*

The Court believes that Defendant's counsel cross-examined the medical experts effectively. The Court does not believe that Defendant's allegations support a claim that his counsel's actions were objectively unreasonable in this case in consideration of all the evidence presented at trial. The evidence of Defendant's guilt was overwhelming. The Court does not believe there is any reasonable belief that Defendant's counsel could have obtained a medical expert to testify on his behalf. As a result, the Court declines to appoint independent counsel concerning his ineffective assistance of counsel claim and denies Defendant's motion for judgment notwithstanding the verdict or a new trial, where this issue was first raised by Defendant's counsel."

¶ 82   On June 28, 2022, the trial court held a hearing advising defendant that the preliminary *Krankel* hearing was denied. The same day, defendant filed a notice of appeal. On July 15, 2022, defendant filed an amended notice of appeal. This appeal followed.

¶ 83                                    II. ANALYSIS

¶ 84   Defendant raises three issues on appeal. First, he contends that the trial court abused its discretion by allowing the State to present four-year-old A.W. as a "live-exhibit" in the courtroom during her grandmother's testimony, because her presence was irrelevant and the prejudicial effect of A.W. entering the jury box and interacting with the jurors outweighed any probative value of her presence at trial. Second, defendant argues that defense counsel provided ineffective assistance where she failed to retain a medical expert to rebut the State's medical evidence and to confront the State's medical experts with relevant professional literature regarding the unreliability of shaken baby syndrome and abusive head trauma. Finally, defendant argues that he demonstrated that defense counsel neglected his case during a preliminary *Krankel* inquiry. For the reasons that follow, we affirm. We consider each issue in turn.

23

¶ 85                    A. A.W.'s Presence in the Courtroom

¶ 86    First, defendant argues that the trial court erred by allowing A.W.'s father to carry A.W. into the courtroom during her grandmother's testimony for identification purposes, where the court's ruling resulted in A.W. exploring the courtroom, entering the jury box, and interacting with the jurors. The State responds, arguing that the trial court did not abuse its discretion by permitting the identification of A.W. in front of the jury. Alternatively, the State argues that any error was harmless. We agree with defendant that A.W.'s presence in the courtroom constituted error, however, we agree with the State that the error was harmless.

¶ 87    "The decision whether to admit or exclude evidence is left to the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion resulting in manifest prejudice to the defendant." *People v. Barnes*, 2013 IL App (1st) 112873, ¶ 41. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 88    In the case before us, defendant contends that the trial court abused its discretion by allowing the State to present A.W. to the jury. Defendant argues that the prejudicial effect of this evidence outweighed its probative value. In the context of determining whether the prejudicial effect of the evidence substantially outweighs its probative value, our supreme court has recognized that prejudice means " 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt or horror.' " *People v. Eyler*, 133 Ill. 2d 173, 218 (1989) (quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984)).

¶ 89    The State argues that it was required to prove great bodily harm. However, here, the State established great bodily harm through numerous other avenues. The jurors viewed photographs of

24

A.W. in the hospital. The jury heard testimony describing all of the photographs entered into evidence. Medical testimony from treating nurses and physicians established great bodily harm. The jury heard testimony from first responders about A.W.'s condition. Finally, the jury heard testimony about her condition before and after the incident from Curtis, Parrish, and defendant himself. Parading A.W. into the courtroom was merely cumulative and not necessary for the State to establish great bodily harm. Defendant relies on *Barnes*, 2013 IL App (1st) 112873, ¶ 46, where our colleagues in the first district determined that "[u]sing a four-year-old child as an exhibit was extremely prejudicial because the risk that it would unduly influence the outcome by inflaming the passions of the jury was high, while the probative value of such evidence was marginal where the State had several other avenues through which to establish the element" of great bodily harm. We find support in *Barnes* to conclude that it was an abuse of discretion to allow the State to present A.W. to the jury.

¶ 90    However, as noted in *Barnes*, error notwithstanding, this court must consider whether the error resulted in manifest prejudice to defendant. *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). The State argues that the presentation of A.W., even if in error, was harmless in light of the overwhelming evidence of defendant's guilt. We agree.

¶ 91    "In order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. St. Pierre*, 122 Ill. 2d 95, 113-14 (1988); see *People v. Fort*, 2014 IL App (1st) 120037, ¶ 19; see also *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). The State bears the burden of proof on this point. *Patterson*, 217 Ill. 2d at 428; see *People v. Davis*, 393 Ill. App. 3d 114, 132 (2009). To determine whether an error is harmless, it is necessary to review the facts of the case and the evidence at trial

25

to determine the effect of the unlawfully admitted evidence upon the outcome of the trial. See *St. Pierre*, 122 Ill. 2d at 114; see also *Davis*, 393 Ill. App. 3d at 133.

¶ 92 In the case before us, the evidence supporting defendant's conviction was overwhelming. Curtis testified that A.W. was overall a normal healthy child, and after defendant began babysitting A.W., A.W. often had bruises on her body. First responders, including EMTs and law enforcement, responded to A.W.'s home in Noble, Illinois, where they observed both A.W. and defendant, and first responders testified about the extent of A.W.'s injuries. First responders also testified about the family puppy, and testimony established that the dog was small and did not jump. This testimony was in direct contrast to defendant's version of events that the puppy jumped on A.W., knocking her backwards in the bathtub, causing her brain injury. A treating nurse and multiple treating physicians testified about A.W.'s medical condition. All medical experts agreed that A.W.'s injuries were the result of nonaccidental head trauma. Finally, defendant's own text and Facebook messages established that he was frequently frustrated with A.W., "beat" her, and suggested that he would kill her on multiple occasions. Moreover, Parrish testified that A.W. acted normally prior to her leaving for work on the date of the incident. Defendant was alone with A.W. when the injuries occurred. Based on our review of the trial in this matter, we cannot say that A.W.'s presence in front of the jury constituted a material factor in defendant's conviction or otherwise prevented him from receiving a fair trial so as to require reversal. Although we find that that trial court abused its discretion by allowing the State to present A.W. to the jury, in light of the overwhelming evidence of defendant's guilt, we find the error is harmless.

¶ 93                                    B. Expert Witness Testimony

¶ 94 Next, defendant argues that defense counsel provided ineffective assistance for failing to retain an expert to rebut the State's medical evidence and to confront its medical experts with

26

relevant professional literature regarding shaken baby syndrome and abusive head trauma. The State responds, arguing that defendant failed to demonstrate that counsel was ineffective for declining to retain a medical expert, where counsel's decision was not objectively unreasonable and defendant cannot establish prejudice. We agree with the State.

¶ 95    Ineffective assistance of trial counsel claims are subject to the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

¶ 96    To satisfy the deficiency prong of *Strickland*, counsel's performance must be so deficient that counsel was "not functioning as the 'counsel' guaranteed by the sixth amendment [(U.S. Const., amend. VI)]." *People v. Easley*, 192 Ill. 2d 307, 317 (2000). A party raising this claim must overcome "the strong presumption the challenged action or inaction of counsel was the product of sound trial strategy." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998).

¶ 97    To satisfy the prejudice prong of *Strickland*, the defendant must demonstrate, but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694; *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Failure to satisfy either prong defeats the claim. *Strickland*, 466 U.S. at 697; *Coleman*, 183 Ill. 2d at 397.

¶ 98    Defendant argues that trial counsel rendered ineffective assistance of counsel by failing to retain an expert witness contesting the theory of shaken baby syndrome in order to dispute the State's expert findings. Initially, we note that defendant misconstrues the record, where no expert

27

witness testified about "shaken baby syndrome" in this case. The State did not retain expert witnesses in this case. Rather, the State called treating nurses and physicians, who actually rendered care to A.W. during her time in the hospital. Although Dr. Reifsteck ultimately determined that A.W. suffered "a case of abusive head trauma[,]" he never testified that A.W. was a victim of shaken baby syndrome. Moreover, no expert witnesses in this case offered opinions or testimony suggesting that defendant himself inflicted harm on A.W. The treating medical staff ultimately determined that A.W. suffered a nonaccidental trauma.

¶ 99 Additionally, in his brief, defendant relies on a variety of medical literature as well as case law citing such literature. This material was not presented at trial. It is not appropriate for this court to take judicial notice of a dispute amongst the medical community as to the validity and nuances of abusive head trauma or shaken baby syndrome, particularly when no expert testified that A.W. suffered from shaken baby syndrome. *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003) (stating that "[a] reviewing court will not take judicial notice of critical evidentiary material that was not presented to and not considered by the fact finder during its deliberations.").

¶ 100 Turning to the merits of defendant's claim of ineffective assistance, "[t]he decision whether to call particular witnesses is a matter of trial strategy and thus will not ordinarily support an ineffective-assistance-of-counsel claim." *People v. Patterson*, 217 Ill. 2d 407, 442 (2005). Failure to call an expert witness, even where doing so may have made the defendant's case stronger, is not *per se* ineffective assistance because the State could always call its own witness to offer a contrasting opinion. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). As the Supreme Court observed in Strickland:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act

28

or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

¶ 101 Defendant claims that a defense expert would have been able to testify at trial to counter the State's medical witnesses. Defendant also argues that a defense expert "would have served the crucial role of advisor to trial counsel in preparing the theory of defense." He further claims that counsel's performance was unreasonable, where counsel failed to confront Dr. Reifsteck with "relevant professional literature" that would have undermined his opinions.

¶ 102 Here, although defense counsel did not call an expert witness, the record reveals that counsel extensively cross-examined the State's medical witnesses. Defense counsel elicited testimony from medical witnesses that they were unable to determine the age of bruising on A.W.'s body. On cross-examination, defense counsel adduced from Dr. McCool the bruises on A.W.'s body were in various stages of healing. Additionally, Dr. McCool noted in his report that the injuries were due to "non-accidental trauma." However, Dr. McCool noted that the hematoma to the back of the head "could happen" if a dog jumped on a child. Moreover, defense counsel elicited testimony from Jennings that Jennings could not make a "judgment call" on how A.W. received the injuries.

¶ 103 Dr. Reifsteck was the only witness to testify that A.W. suffered an abusive head trauma. Defense counsel strenuously cross-examined Dr. Reifsteck. Defense counsel established that Dr. Reifsteck was not a "treating physician" for A.W. Rather, he was a consulting physician who

reviewed the reports of other physicians, and he formed his opinion based on that. We note, however, that Dr. Reifsteck did, indeed, examine A.W. while she was at Carle Hospital. Nonetheless, defense counsel established through Dr. Reifsteck that retinal hemorrhaging can occur outside of abusive head trauma. On cross-examination, Dr. Reifsteck testified that he could not "say exactly what happened." Dr. Reifsteck agreed with defense counsel that it was possible that "a person could have injuries" like A.W. "that would not be intentional."

¶ 104   Defense counsel used the testimony elicited on cross-examination to argue during closing arguments that none of the State's witnesses, including the medical witnesses, offered any testimony about what happened to A.W. Counsel argued that the jury should focus on the brain bleed, and not on the bruises on A.W.'s body. Counsel argued: "She fell and she hit her head on the bathtub. You've heard no other evidence or no other explanation at all all week from anyone explaining how this happened. What they're doing is they're looking and they're saying, well, he sent those text messages and she had those bruises, so this isn't an accident. But they didn't tell you what it did, what it was then." Based on the cross-examination of the medical witnesses and defense counsel's closing argument, we cannot say that counsel's performance fell below an objective standard of reasonableness.

¶ 105   "While the testimony of an expert may have been more effective than counsel's cross-examination and closing argument[,]" "we cannot say that failure to produce such an expert fell below an objective standard of reasonableness, considering all the circumstances, or so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *People v. Mehlberg*, 249 Ill. App. 3d 499, 546 (1993). For these reasons, we find defense counsel's decisions to challenge the State's experts' opinions through

cross-examination and closing argument, rather than independent expert testimony, fell within the wide range of reasonable professional conduct.

¶ 106   Moreover, defendant's claim fails to meet the second prong of *Strickland*. See *Strickland*, 466 U.S. at 687-88, 694. While medical testimony was certainly important to the prosecution of this case, the evidence against defendant was not limited to medical testimony. The evidence also included, among other things, A.W.'s physical condition both before and after she started living with defendant and defendant's own words admitting to abusing A.W. on occasions prior to February 6, 2020. Simply stated, as evidenced above, the evidence of defendant's guilt was overwhelming. Based on the evidence and record before us, and in light of the overwhelming evidence the State presented against defendant, we cannot say that defendant was prejudiced by his counsel's failure to obtain an expert witness. Accordingly, defendant was not deprived of his constitutional right to the effective assistance of counsel by trial counsel's decision to refrain from calling an expert witness.

¶ 107                                C. *Krankel* Inquiry

¶ 108   Finally, defendant contends that defense counsel "possibly neglected" his case by failing to obtain a defense medical expert because she mistakenly believed that she would be obligated to turn over any unfavorable expert opinions to the prosecution. The State responds, arguing that further hearing on defendant's claims of ineffectiveness lack merit. For the reasons that follow, we find that the trial court conducted an adequate preliminary *Krankel* hearing.

¶ 109   Under *Krankel* and its progeny, the trial court is obligated to inquire into a defendant's *pro se* posttrial claims that he was denied the effective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11; *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). This inquiry, which is sometimes referred to as a "preliminary *Krankel* inquiry" (*People v. Jolly*, 2014 IL 117142, ¶ 28), requires

31

the court to ascertain the nature of defendant's ineffective assistance of counsel claims and evaluate their potential merits (*People v. Mays*, 2012 IL App (4th) 090840, ¶ 58). To understand the factual bases of defendant's allegations, it is proper for the court to question both trial counsel and defendant. *Ayres*, 2017 IL 120071, ¶ 12. If defendant's allegations show that trial counsel may have neglected defendant's case, the court should appoint new counsel and set the matter for a hearing. *Id.* ¶ 11; *Moore*, 207 Ill. 2d at 78. If the court determines that the claims lack merit or pertain only to matters of trial strategy, however, then no further action is required. *Id.* A preliminary *Krankel* inquiry "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

¶ 110   A defendant's *pro se* claim lacks merit if it is misleading, conclusory, or legally immaterial or fails to " 'bring to the trial court's attention a colorable claim of ineffective assistance of counsel.' " *People v. Cook*, 2018 IL App (1st) 142134, ¶ 104 (quoting *People v. Johnson*, 159 Ill. 2d 97, 126 (1994)). "The court may, of course, rely on its own legal knowledge of what does and does not constitute ineffective assistance." *Mays*, 2012 IL App (4th) 090840, ¶ 57. The court may also base its evaluation of defendant's claims on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79.

¶ 111   "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id.* at 78. Whether the court properly conducted a preliminary *Krankel* inquiry is a legal question reviewed *de novo*. *Jolly*, 2014 IL 117142, ¶ 28. If, however, the court conducted the *Krankel* inquiry properly and reached a determination on the merits, we will reverse only if its action was

manifestly erroneous. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Id.*

¶ 112   The State acknowledges that "the defense is not obligated to disclose unfavorable reports or opinions by non-testifying witnesses." However, the State contends that any mistake of law does not merit remand and the appointment of new counsel where, after conducting a preliminary inquiry into defendant's ineffective assistance claim, the court correctly concluded that defendant's claim had no merit. We agree with the State.

¶ 113   Although we recognize that defense counsel operated, in part, under a misunderstanding that she may have to disclose an unfavorable report to the State, counsel also offered strategic reasons for failing to obtain a medical expert on defendant's behalf. Counsel stated, "I felt like with cross-examination of the medical doctors and some of the other people that the State put on, we were able to bring out that they couldn't determine what caused the injury either, which would essentially be the same thing if we put on an expert as well, and that—sometimes I think it's better when you have a jury if you don't—if it's not the same thing over and over and over again."

¶ 114   In its docket entry ruling on defendant's claim of ineffective assistance of counsel, the court acknowledged counsel's confusion and noted that counsel "asserted that this was a matter of trial strategy and that she was concerned that having another medical expert review the medical information could result in another medical expert testifying against her client rather than in her client's favor." However, the court correctly noted that it could consider the merits of defendant's claim in its entirety. The court ultimately concluded that defense counsel cross-examined the medical experts effectively. The court also determined that the evidence of defendant's guilt was overwhelming, and counsel likely could not have obtained a medical expert to testify on his behalf.

33

¶ 115   We find our supreme court's reasoning in *Roddis*, 2020 IL 124352, instructive. There, the supreme court reiterated that, at a *Krankel* hearing, a trial court may base its determination of the merits of a defendant's ineffective assistance claims on its own knowledge of counsel's trial performance and emphasized, "[t]he trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect." *Id.* ¶ 56.

¶ 116   Viewing the defendant's ineffective assistance of counsel allegations in the context of the entire record on appeal, we conclude that the trial court's preliminary *Krankel* inquiry was proper and supported the court's denial of the defendant's posttrial motions. The court rightfully rejected defendant's claims based on its firsthand knowledge of counsel's performance during the trial and the fact that the claims related to trial strategy. We find that the court's determination that trial counsel provided effective assistance to defendant was not manifestly erroneous, and the record does not reveal that the appointment of counsel was necessary for investigation into defendant's claims.

¶ 117                                    III. CONCLUSION

¶ 118   For the foregoing reasons, we affirm defendant's Richland County conviction for aggravated battery of a child.

¶ 119   Affirmed.